[No. S044011. Jan. 8, 1996.]

HANSEN BROTHERS ENTERPRISES, INC., Plaintiff and Appellant, v.
BOARD OF SUPERVISORS OF NEVADA COUNTY et al., Defendants
and Respondents.

536

## COUNSEL

Diepenbrock, Wulff, Plant & Hannegan, The Diepenbrock Law Firm, John V. Diepenbrock and Mark D. Harrison for Plaintiff and Appellant.

James S. Burling and Daniel T. Fitzpatrick as Amici Curiae on behalf of Plaintiff and Appellant.

James A. Curtis, County Counsel, and Harold E. DeGraw, Chief Deputy County Counsel, for Defendants and Respondents.

H. Peter Klein, County Counsel (Mendocino), Frank Zotter, Jr., Deputy County Counsel, Dwight L. Herr, County Counsel (Santa Cruz), Jonathan Wittwer, Chief Deputy County Counsel, Shute, Mihaly & Weinberger and Fran M. Layton as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**BAXTER, J.**—The principal issue in this case is whether the "diminishing asset" doctrine is applicable to a mining operation which is carried on as a legal nonconforming use[1] under a zoning ordinance that presently excludes mining from the permissible uses of the property. The 1954 Nevada County land use and development ordinance which governs the property that is the subject of this dispute also forbids continuation of nonconforming uses which have ceased operation for periods in excess of 180 days. Therefore, because the "mining operation" at issue is part of an aggregate production business, we must also decide whether the aggregate business itself, including all aspects of that business, is the nonconforming use, or if the individual mining operations which recover the aggregate components—sand, gravel, and rock taken from a riverbed and its banks and rock quarried from a hillside—are the nonconforming use which the owner has a vested right to continue.

---

[1] A legal nonconforming use is one that existed lawfully before a zoning restriction became effective and that is not in conformity with the ordinance when it continues thereafter. (*Hill* v. *City of Manhattan Beach* (1971) 6 Cal.3d 279, 285 [98 Cal.Rptr. 785, 491 P.2d 369]; *City of Ukiah* v. *County of Mendocino* (1987) 196 Cal.App.3d 47, 56 [241 Cal.Rptr. 585].) The use of the land, not its ownership, at the time the use becomes nonconforming determines the right to continue the use. Transfer of title does not affect the right to continue a lawful nonconforming use which runs with the land. (See 8A McQuillin, Municipal Corporations (3d ed. 1994) § 25.185, p. 33 (McQuillin); 1 Anderson, American Law of Zoning (3d ed. 1986) § 6.40. See, e.g., *City of Los Angeles* v. *Gage* (1954) 127 Cal.App.2d 442 [274 P.2d 34]; *County of Orange* v. *Goldring* (1953) 121 Cal.App.2d 442 [263 P.2d 321].)

The question of whether the diminishing asset doctrine is recognized in California arises because, under both the express terms of the Nevada County zoning ordinance[2] and generally applicable rules governing the continuation of a nonconforming use, that use may not expand onto areas of the property that were not being used at the time the zoning ordinance became effective. Resolution of the question is complicated in this case because the mining operations at the Bear's Elbow Mine owned and operated by plaintiff Hansen Brothers Enterprises, Inc. (Hansen Brothers), are for materials that are not distributed uniformly throughout the property and none is mined continuously. One, the removal of gravel and rock from the riverbed and its adjacent bank area is for a type of rock and gravel that was once a replenishing resource. The other mining operation has been to quarry the "hillside" about 600 feet from the river for rock.[3] That area has contributed relatively small amounts of rock to the aggregate produced on the property in the past. Under plaintiff's proposal for future development, rock quarrying farther into the hillside of the property away from the river will constitute the principal source of the crushed rock component of the aggregate produced from materials on the property.

The principles that govern this area of law, while arcane, are important to both surface mining enterprises[4] and the industries that are dependent on their output. They are also of great concern to local governmental officials

---

[2]The ordinance provides: "Any use lawfully in existence at the time this Chapter or amendments thereto takes effect, although such use does not conform to the provisions of this Chapter, may continue as follows:

"A. No such use shall be enlarged or intensified. Nor shall any such use be extended to occupy a greater area of land than that occupied at the time of the adoption of this Ordinance. Nor shall any such use be moved in whole or in part to any other portion of the lot or parcel of land occupied at the time of the adoption of this Chapter or amendment thereto.

"B. If the nonconforming use is discontinued for a period of one hundred eighty (180) days or more, any following use shall be in conformity with all applicable requirements of this Chapter." (Nevada County Land Use and Development Code, art. 29, § L-II 29.2.)

[3]The parties and administrative agencies refer to both the area to be quarried in the future and this area as hillside. One witness, Alan Hess, referred to the quarried area 600 feet from the river as "stream bank" to distinguish it from the higher hillside. Our references to "hillside" include both areas. We use the term "bank" to refer to the area abutting the riverbed.

[4]" 'Surface mining operations' " are defined for all purposes relevant here as: "[A]ll, or any part of, the process involved in the mining of minerals on mined lands by removing overburden and mining directly from the mineral deposits, open-pit mining of minerals naturally exposed, mining by the auger method, dredging and quarrying, or surface work incident to an underground mine. Surface mining operations shall include, but are not limited to:

"(a) Inplace distillation or retorting or leaching.

"(b) The production and disposal of mining waste.

"(c) Prospecting and exploratory activities." (Pub. Resources Code, § 2735.)

All statutory references are to the Public Resources Code unless otherwise noted.

charged with responsibility of eliminating nonconforming uses of properties under their jurisdiction.[5]

The Court of Appeal held that Hansen Brothers' proposal for future mining constituted an impermissible intensification of the nonconforming use. It therefore affirmed the judgment of the superior court, which had denied a petition for a peremptory writ of mandate to set aside a decision of the Nevada County Board of Supervisors (the Board) denying approval of the mining plan. The Board had concluded that, while Hansen Brothers had a vested right to mine a portion of its property, any right it might have had to quarry the hillside area of its property for rock had been lost by discontinuance for periods in excess of 180 days, and that Hansen Brothers' proposal for future mining constituted an impermissible intensification of the nonconforming use. Because the Court of Appeal agreed with the last conclusion, it did not address the questions related to the nature of plaintiff's nonconforming use, whether the right to continue the nonconforming use had been lost under the cessation provision of the ordinance, or whether the scope of a vested right to mine extends over the entire parcel.

We conclude that the diminishing asset doctrine is recognized in California. We also conclude that the nonconforming use which Hansen Brothers may claim a right to continue is the aggregate production business that was being operated on the property its predecessors owned in 1954 when the Nevada County zoning ordinance was adopted. That business, and the nonconforming use, include all aspects of the operation that were integral parts of the business at that time, including mining replenishable materials from the riverbed and banks and quarrying rock from the hillside; crushing, combining, and storing the mined materials which compose aggregate; and selling or trucking the aggregate from the property. Consistent with the diminishing asset doctrine applicable to extractive operations, the right of normal expansion of a nonconforming use in this case includes extending the rock quarry aspect of the business to those other areas of the property owned in 1954 into which the owners had then objectively manifested an intent to mine in the future.[6]

We reach these conclusions on the basis of undisputed evidence in the record that Hansen Brothers' predecessors in interest were operating the

---

[5]An amicus curiae brief in support of Nevada County has been filed on behalf of 21 other counties. Sixty-two cities and towns have joined in that brief. They argue both that Hansen Brothers has no right to expand its mining operations to the entire area shown on its proposal and that recognition of the diminishing asset doctrine in California would be contrary to the intent of the Legislature, presumably the intent underlying statutes governing zoning and mining. (See, e.g., Pub. Resources Code, § 2710; Gov. Code, § 65000 et seq.)

[6]Whether the diminishing asset doctrine has any application to a renewable or replenishing resource such as the riverbed rock and gravel is not an issue in this case. Our holding that the

aggregate business, including extraction of sand and gravel from the river-bed and quarrying the hillside area of the property for rock in 1954. Nonetheless, the record is inadequate to permit us, or the lower courts and administrative bodies, to determine (1) whether the nonconforming use which Hansen Brothers claims a vested right to continue extends to all of the Nevada County property it identifies as the Bear's Elbow Mine and over which it claims a vested right to continue operations, or (2) the extent of the area over which an intent to quarry for rock was objectively manifested in 1954.

We also conclude that the evidence does not support the rulings of the Court of Appeal and the superior court that Hansen Brothers' proposal for future rock quarrying would be an impermissible intensification of the nonconforming use of its property. Finally, we conclude that the evidence supports the finding of the superior court that Hansen Brothers' overall aggregate production business has not been discontinued. Therefore Hansen Brothers has not lost the right to continue and expand its quarrying activity as an integral part of that nonconforming use, but the right is limited to the area over which the owners objectively manifested an intent to expand the quarry in 1954.

Nonetheless, as we explain below, because a court cannot determine on this record that Hansen Brothers is entitled to the relief it seeks, the petition for writ of mandate to compel the Board to approve a Surface Mining and Reclamation Act of 1975 (§ 2710 et seq.) reclamation plan for the Hansen Brothers' property was properly denied by the superior court. However Hansen Brothers is entitled to have the order denying approval of the plan set aside and to have its application reconsidered. We shall therefore reverse the judgment of the Court of Appeal affirming the superior court judgment denying Hansen Brothers' petition for writ of mandate, but we shall do so with directions that on setting aside its judgment the superior court conduct further proceedings. (See Code Civ. Proc., § 1094.5, subd. (e).)

I

*Background*

Hansen Brothers owns and operates the Bear's Elbow Mine, an aggregate business in which the materials combined and sold as aggregate are obtained by surface mining and quarrying on part of a 67-plus-acre tract of land

diminishing asset doctrine is recognized in California should not be read as expressing any opinion on that question.

comprised of several parcels. Most of the property on which the business operates lies in Nevada County. Seven acres are in Placer County. The property straddles the Bear River, which at that location forms the boundary between the two counties, and includes property at the confluence of Willow Creek and the Bear River. The property is in a remote, mountainous area northwest of Colfax and south of Grass Valley. It is made up of riverbed, adjacent hillsides, and a flat yard area which is used for processing and storage. Recently a few homesites have been developed near the mine.

The aggregate produced at the Bear's Elbow Mine is sold for road building, concrete, filters and water purification systems, and other uses. Prior to construction of the Rollins Reservoir Dam on the river upstream from Bear's Elbow Mine, most of the rock, sand, and gravel used for the aggregate was taken from the riverbed and banks where the flow of the river replenished the supply and the cost of extraction was lower than on the hillsides, which have been held in reserve and are, therefore, largely unexcavated. Some quarrying for rock took place on both the Placer County and Nevada County hillsides within a few hundred feet of the Bear River, however. The rock is mixed with the riverbed aggregate materials as needed to meet buyers' specifications. Some sales are of blended materials from the riverbed, the banks of the river, and the hillside. In others the materials are sold separately. Since construction of the upstream dam, the reservoir behind the dam has retained the migrating gravels and the river no longer deposits sufficient quantities of gravel to meet market demand. Therefore the drainage channel of the river is not to be mined again unless a significant amount of material is washed into the area. Future extraction will be principally rock quarried from the hillside of the Nevada County property.

Production of aggregate from sand, gravel, and rock mined and quarried[7] on the Bear's Elbow Mine property commenced almost 50 years ago. Arlie

---

[7] A "quarry" "is similar to a mine, in the sense that the material removed, be it mere rock or stone or valuable marble, is removed because of its value for some other purposes [than development of the site]. It is distinguished from a mine in the fact that it is usually open at the top and front . . . and, in the ordinary acceptation of the term, in the character of the material extracted . . . ." (*In re Kelso* (1905) 147 Cal. 609, 610-611 [82 P. 241].)

While mining is the all-encompassing term, extracting hard rock is commonly referred to in the industry as "quarrying." Taking sand and gravel from a riverbed is "alluvial mining," while taking those materials from floodplain terraces adjacent to a river is termed "terrace mining." (See, e.g., *Sierra Club* v. *County of Sonoma* (1992) 6 Cal.App.4th 1307, 1313-1314 [8 Cal.Rptr.2d 473].) References herein to Hansen Brothers' past and proposed extraction of rock from the hillside will use the term "quarrying" to distinguish this aspect of its operations from the mining for sand and gravel in the riverbed and bank.

A " 'mine' " is defined as "all mineral bearing properties of whatever kind or character, whether underground, or in a quarry or pit, or any other source from which any mineral

Hansen and a brother began working at the Bear's Elbow Mine in 1946 as employees of the original owners, George Rondini and Gustave Vollmer, who had established the business after claiming the property under a placer mining claim. The Hansen brothers purchased the mine in 1954. Hansen Brothers, a corporation formed by the brothers, now owns and operates the business. Arlie Hansen testified before the planning commission that the Bear's Elbow mining operation has been continuous since 1954, and that the operation included "taking the available material from the river and combining it with material from the banks, the hillsides and producing a usable material . . . ." In his testimony before the Board, he stated that as long as he has been associated with the operation of the Bear's Elbow mine, material has been taken from both the hillside and the riverbed to form the aggregate that is produced and sold. Quarried material has been stored on the site both before and after processing. A combination of river gravel and hillside rock is used to produce aggregate at the Bear's Elbow Mine, as the individual gravels are used for different purposes but can be combined for use where neither would be suitable by itself.[8]

At present, aggregate is occasionally picked up by a customer on the mine property or it is trucked to a customer, but most is trucked to and sold at another yard owned by Hansen Brothers. Hansen Brothers presented evidence that the equipment at the mine is maintained in working order and that the company continues to remove aggregate from the site for use at the other Hansen Brothers yard in Grass Valley. Orson Hansen, the president of Hansen Brothers, testified that material had been sold directly from the mine within the year preceding his testimony, but the firm has no records that might establish the amount of material that has been taken from the mine each year, because the materials are weighed as sold at the other yard. There was contrary evidence in the form of testimony by persons who live close enough to the mine to observe its operation that one of those witnesses had been unable to purchase gravel at the mine recently and others had seen no quarrying activity and had seen only an occasional truckload of material being removed.[9]

The volume of material that has been mined and quarried in past years has been driven by market forces and has varied from year to year. Demand for

substance is or may be obtained." (§ 2200.) " 'Minerals' means any naturally occurring chemical element or compound, or groups of elements and compounds, formed from inorganic processes and organic substances, including, but not limited to, coal, peat, and bituminous rock, but excluding geothermal resources, natural gas, and petroleum." (§ 2005.)

[8]Aggregate from the Bear's Elbow Mine is sold to state, county, city, and forestry units. The combined product is more stable and durable, and meets the general specifications of the state.

[9]One witness testified that in the past two years he had seen only three or four trucks go by on the road, and had not heard any operation at the mine other than the trucks. Another

the aggregate is seasonal and fluctuates with the needs of the building industry. At times aggregate production has been as much as 133,330 cubic yards (200,000 tons) of material a year, but only 209,000 cubic yards of rock have been quarried from the Placer County and Nevada County hillside areas of the property during the 50 years the business has been in operation. Of that, 44,700 cubic yards of rock have come from the hillside area in Nevada County.[10] The plant manager testified at the November 1989 hearing before the county planning commission that during the 15 to 20 years that he had been associated with the operation, approximately 3,000,000 tons of aggregate had been produced at Bear's Elbow Mine. One-third of that consisted of base rock. One-fifth of the total was rock taken from the hillside quarry.[11] The last hillside quarrying took place in December 1988, but there had been periods of 180 days, and up to 3 years, prior to that during which no quarrying occurred because stockpiles of rock were adequate to meet need. The overall aggregate production and sales operation had been continuous, however, and at the time of the hearing about 6,000 tons of material from previous mining were stored on the site for use as needed. The total annual average yield of rock over 34 years of operation is 6,200 cubic yards, of which only 1,300 cubic yards is from the Nevada County side of the mine.

Unlike the recovery of aggregate materials from the riverbed and the banks of the river where the sand, rock, and gravel are exposed or readily accessible, Hansen Brothers' proposed quarrying of rock on the hillside will require removal of approximately 1,000,000 cubic yards of topsoil overburden. The topsoil will be stored on the property and used in the reclamation process when it will be spread over the quarry area. The rock below the overburden is metamorphic bedrock and fractured bedrock.

---

witness testified that she is able to hear the gravel operation running when it is working, that it had not been running, and there had not been trucks going up and down the road. "It has basically closed down." She testified that the last time the mine was operating on a full-time basis, that is, for more than one hour or having more than one truck on the road, was in 1986. There had been one truck on the road in 1989.

A resident of the Willow Creek Acres tract adjoining the quarry site testified that until 1986 residents were able to purchase gravel at the quarry site, but since then it has not been available. Since the winter of 1986-1987 he had not met trucks on the roads adjacent to the mine and "[t]he quarry is closed."

[10]This figure is an estimate by Alan Hess, a photogrammetric engineer, made on the basis of aerial photographs taken at intervals between 1955 and 1988. The estimate of Nevada County quarrying covers only the area near the river which the witness termed "stream bank." Hess could not estimate the amount of rock quarried from a site, now overgrown with trees, located farther from the river on the higher area which he termed "hillside." Hess was called by Hansen Brothers to estimate "hillside" rock production. The "stream bank" area from which he testified this material came is part of the area which the parties refer to as "hillside."

[11]The Court of Appeal, considering only hillside production, erroneously stated that the mine produced "209,000 cubic yards of aggregate" between 1955 and 1989.

## II

### *The Mining Plan*

This action arose out of Hansen Brothers' efforts to comply with the Surface Mining and Reclamation Act of 1975 (§ 2710 et seq.) (hereafter SMARA). In that act, the Legislature found both that mining is "essential to the continued economic well-being of the state and to the needs of society, and that the reclamation of mined lands is necessary to prevent or minimize adverse effects on the environment and to protect the public health and safety." (§ 2711, subd. (a).) The Legislature declared an intent to ensure that adverse environmental impacts are prevented or minimized and to encourage the production and conservation of minerals while giving consideration to recreational and other values. (§ 2712, subd. (b).)

To achieve those goals, SMARA requires that persons conducting surface mining operations obtain a permit and obtain approval of a reclamation plan from a designated lead agency for areas subjected to post-January 1, 1976, mining. (§§ 2770, 2776.)[12] The Board has enacted a mining ordinance with procedures for review of reclamation plans as required by SMARA, and it is the lead agency in this matter. Because Hansen Brothers operated the Bear's Elbow Mine prior to the enactment of SMARA, the permit requirement does not apply to those operations for which it may claim a vested right (§ 2776).[13] Hansen Brothers does not contest the applicability of the reclamation plan requirement to its operations which are in conformity with all other environmental requirements.

A reclamation plan must include, inter alia, information regarding the "anticipated quantity and type of minerals for which the surface mining

[12]Gravel extraction from a riverbed is surface mining within the meaning of section 2735. (*City of Ukiah* v. *County of Mendocino, supra*, 196 Cal.App.3d 47, 50, fn. 3.)

The county conceded in its answer to the petition for writ of mandate that mining operations have been conducted on the property since 1946 and that the operation has "at various times" included extraction of aggregate from the hillsides and quarrying of rock, as well as the processing, storage and sale of the mined materials on the site. While it contested Hansen Brothers' right to continue quarrying rock from the hillside it did not contest its right to continue mining in the streambed or conducting the other activities that are part of the aggregate business. The Board had concluded that the hillside quarrying was a "different operation from the river operation due to the difference in materials, extraction procedures, and environmental impacts, as well as location." It did not consider whether it was part of an ongoing aggregate production business.

[13]Section 2776: "No person who has obtained a vested right to conduct surface mining operations prior to January 1, 1976, shall be required to secure a permit pursuant to this chapter as long as the vested right continues and as long as no substantial changes are made in the operation except in accordance with this chapter. A person shall be deemed to have vested rights if, prior to January 1, 1976, he or she has, in good faith and in reliance upon a permit or other authorization, if the permit or other authorization was required, diligently

operation is to be conducted" and "[a] description of, and a plan for, the type of surface mining to be employed, and a time schedule that will provide for the completion of surface mining on each segment of the mined lands so that reclamation can be initiated at the earliest possible time on those portions of the mined lands that will not be subject to further disturbance by the surface mining operation." (§ 2772, subds. (c)(2), (6).)

In an effort to comply with SMARA, and claiming a vested right to mine the entire 60-plus-acre area covered by its reclamation plan, Hansen Brothers submitted a plan for mining and quarrying all of the hillside area on the Nevada County portion of the 67 acres it now owns and designates as the Bear's Elbow Mine. The reclamation plan projected mining over the next 100 years or more. In conformity with a "check the box" preprinted form supplied by the county, the plan estimated future mining in the broad production ranges specified on the form, indicating that it anticipated removing 5,000 to 50,000 cubic yards or 50,000 to 250,00 cubic yards of material annually. Hansen Brothers estimated the total reserves remaining in the hillsides of its tract at 5,000,000 cubic yards. The plan proposed the eventual removal over 100 years of the entire 5,000,000 cubic yards of rock at a rate ranging from 5,000 to 250,000 cubic yards per year, with 500,000 cubic yards of waste. The plan proposed excavation of the hillside area to a maximum anticipated depth of 350 feet in the course of exposing and quarrying what would be a vertical wall of rock.

When the county planning commission reviewed the plan, it concluded that Hansen Brothers had lost any vested, nonconforming use status it might have as to the Nevada County hillside area of the Bear's Elbow Mine through discontinuance of quarrying in that area. The commission also concluded that, if Hansen Brothers had a vested right to quarry the hillside, the proposed excavation would be a prohibited intensification of the nonconforming use. It determined for those reasons that a permit would be required for the proposed hillside operation, and consequently took no action on the reclamation plan.

Hansen Brothers appealed to the Board, arguing that it conducted an integrated business which included both mining and "on-site conveyance,

commenced surface mining operations and incurred substantial liabilities for work and materials necessary therefor. . . ."

Contrary to the assertion of amici curiae counties and cities, Hansen Brothers does not claim a vested right to conduct unregulated mining without a permit. It asserts only that section 2776 exempts it from obtaining a conditional use permit to continue the mining operation that it was conducting prior to January 1, 1976, and which was a legal nonconforming use at that time.

crushing, sorting, washing, storage, and transportation of the mined product," an overall operation that had been conducted uninterrupted since 1946. It claimed that, as part of that business, quarrying on the hillside had been conducted every two or three years, with the material stored for ongoing use. Whenever the supply of rock was near depletion, new quarrying was undertaken.

The Board rejected the "unitary operation" argument and found that "[a]t various times in the past, operations at the Bear's Elbow Mine have included both in-the-riverbed extraction of aggregate and hillside quarrying of rock outside the riverbed, together with processing, storage and sale of mined materials on site." The Board also found, however, that Hansen Brothers had discontinued the hillside quarrying operation for 180 days or more and therefore,[14] pursuant to the county land-use and development ordinance, had lost its vested nonconforming use status as to that aspect of the mining operations. The Board found: "The hillside operation is a different operation from the river operation due to the difference in materials, extraction procedures and environmental impacts, as well as location and has lost its legal non-conforming use status. Storage of quarried materials in and of itself is insufficient to constitute continuance of the hillside operation." Finally, the Board ruled that the reclamation plan contemplated enlarged or intensified operations and changes in operation that were so substantial as to be outside the rights that were vested under both section 2776 and the land use and development ordinance. The Board denied the appeal from the commission recommendation. It rejected the reclamation plan and denied Hansen Brothers' claim to a vested right to quarry the hillside area without a conditional use permit.[15]

Hansen Brothers appealed the former ruling to the State Board of Mining and Geology pursuant to SMARA, and sought review of the Board's ruling that a conditional use permit was required for future quarrying by the petition for writ of "administrative mandate" (Code Civ. Proc., § 1094.5) which underlies this appeal. It claimed in the petition, as relevant here, that there was no evidence that its hillside operation on the Bear's Elbow Mine

[14]The finding was based on admissions made on behalf of Hansen Brothers that hillside extraction had lapsed for one or more periods of three years or more; testimony of the plant manager that there had been no hillside quarrying in the area close to the river since 1988; photographs and field inspection showing "very limited" hillside extraction and no apparent recent hillside disturbance on the area of the hillside farther away from the river that had been quarried at an unspecified time, but then had trees up to 15 feet high growing on it; and public testimony that very little hillside quarrying had been conducted and no sales or quarrying had occurred in recent years.

[15]The Board did not, and does not, contest Hansen Brothers' vested right to continue mining the riverbed and bank.

was an operation different from its riverbed operation, and that the Board's action had taken property without just compensation. Hansen Brothers argued that the Board erroneously bifurcated an integrated aggregate mining operation into two mines—one on the hillside and the other in the riverbed.

The trial court denied the petition for writ of mandate. After reviewing the evidence in the administrative record and exercising its independent judgment based on that evidence (see *Halaco Engineering Co.* v. *South Central Coast Regional Com.* (1986) 42 Cal.3d 52, 64-65 [227 Cal.Rptr. 667, 720 P.2d 15]; *Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 34 [112 Cal.Rptr. 805, 520 P.2d 29]), the court found that the aggregate business had not been discontinued for a period of six months, but hillside quarrying had been discontinued for periods of that length. Reasoning that the riverbed mining and hillside quarrying were separate operations, the court ruled that Hansen Brothers did not have a vested right to quarry on the hillside, and that if it ever had such a right, it had been lost by discontinuance of quarrying for a period in excess of six months. It based that ruling on Hansen Brothers' inability to produce evidence to show the extent of recent operations, the testimony by nearby residents that the operation had been largely inactive since 1986 except for storage of aggregate and one or two trips per year by trucks to or from the site, and evidence that one area previously used as a rock quarry was overgrown with trees fifteen feet tall, the court found that the hillside quarry operations were separate operations that had been discontinued for the statutory period.

The court also found that the quarrying operation proposed by Hansen Brothers was a substantial expansion and intensification of use, basing that decision on comparison of previous use and the maximum proposed use under the reclamation plan, including a projected increase to 120 ten-yard truck trips per year instead of the 1 or 2 per year since 1986. Therefore, the court held, the county may require that Hansen Brothers obtain a conditional use permit for any renewed quarrying on the hillside.

The Court of Appeal majority affirmed the judgment denying Hansen Brothers' petition for writ of mandate. It did so on the ground that Hansen Brothers' proposed operation would constitute an enlargement or intensification of the permissible nonconforming use beyond its vested right to mine the property. The court rejected Hansen Brothers' argument that increased production to meet market demand was a permissible expansion of a nonconforming use. Because the Court of Appeal concluded that the Hansen Brothers' vested mining right did not encompass the proposed volume of mineral extraction, the court found it unnecessary to address Hansen Brothers' arguments that it had a right to quarry the entire Nevada County area of

its property under the "diminishing asset" doctrine recognized in *McCaslin* v. *City of Monterey Park* (1958) 163 Cal.App.2d 339, 349 [329 P.2d 522] (hereafter *McCaslin*), and that the Board and the superior court erred in treating its hillside and riverbed mining activities as separate operations when ruling that it did not have a vested right to mine the entire Nevada County area of the tract.

Hansen Brothers repeats all of those arguments in this court. We first address the law applicable to nonconforming uses and mining in particular. We then consider how these rules apply to the Bear's Elbow Mine and Hansen Brothers' proposal for future operations at the mine.

III

*Scope of Vested Mining Rights*

A. *Zoning and related constitutional principles underlying Hansen Brothers' vested rights claim.*

The lower courts and the parties all recognize the constitutional principles under which Hansen Brothers claims a vested right to mine the hillside areas of its property. ■ Adoption of a zoning ordinance which is not arbitrary and does not unduly restrict the use of private property is a permissible exercise of the police power and does not violate the taking clause of the Fifth Amendment of the United States Constitution and comparable provisions of the California Constitution, even when the law restricts an existing use of the affected property. (*Penn Central Transp. Co.* v. *New York City* (1978) 438 U.S. 104, 125 [57 L.Ed.2d 631, 648-649, 98 S.Ct. 2646]; *Euclid* v. *Ambler Co.* (1926) 272 U.S. 365 [71 L.Ed. 303, 47 S.Ct. 114, 54 A.L.R. 1016]; *Beverly Oil Co.* v. *City of Los Angeles* (1953) 40 Cal.2d 552, 558-559 [254 P.2d 865]; *Jones* v. *City of Los Angeles* (1930) 211 Cal. 304, 307 [295 P. 14].)

A zoning ordinance or land-use regulation which operates prospectively, and denies the owner the opportunity to exploit an interest in the property that the owner believed would be available for future development, or diminishes the value of the property, is not invalid and does not bring about a compensable taking unless all beneficial use of the property is denied. (*Lucas* v. *South Carolina Coastal Council* (1992) 505 U.S. 1003 [120 L.Ed.2d 798, 112 S.Ct. 2886]; *Penn. Central Transp. Co.* v. *New York City,* *supra,* 438 U.S. 104, 130 [57 L.Ed.2d 631, 652]; *Hensler* v. *City of Glendale* (1994) 8 Cal.4th 1, 11-12 [32 Cal.Rptr.2d 244, 876 P.2d 1043]; *Furey* v. *City of Sacramento* (1979) 24 Cal.3d 862, 872 [157 Cal.Rptr. 684, 598 P.2d 844].) However, if the law effects an unreasonable, oppressive, or unwarranted interference with an existing use, or a planned use for which a

substantial investment in development costs has been made, the ordinance may be invalid as applied to that property unless compensation is paid. (*Beverly Oil Co.* v. *City of Los Angeles, supra,* 40 Cal.2d 552, 559; *Village of Terrace Park* v. *Errett* (2d Cir. 1926) 12 F.2d 239.) Zoning ordinances and other land-use regulations customarily exempt existing uses to avoid questions as to the constitutionality of their application to those uses. "The rights of users of property as those rights existed at the time of the adoption of a zoning ordinance are well recognized and have always been protected." (*Edmonds* v. *County of Los Angeles* (1953) 40 Cal.2d 642, 651 [255 P.2d 772].)

Accordingly, a provision which exempts existing nonconforming uses "is ordinarily included in zoning ordinances because of the hardship and doubtful constitutionality of compelling the immediate discontinuance of nonconforming uses." (*County of San Diego* v. *McClurken* (1951) 37 Cal.2d 683, 686 [234 P.2d 972]. See also *Jones* v. *City of Los Angeles, supra,* 211 Cal. 304, 310-311.) The exemption may either exempt an existing use altogether or allow a limited period of continued operation adequate for amortization of the owners' investment in the particular use. (See, e.g., *Metromedia, Inc.* v. *City of San Diego* (1980) 26 Cal.3d 848 [164 Cal.Rptr. 510, 610 P.2d 407], revd. 453 U.S. 490 [69 L.Ed.2d 800, 101 S.Ct. 2882]; *National Advertising Co.* v. *County of Monterey* (1970) 1 Cal.3d 875 [83 Cal.Rptr. 577, 464 P.2d 33]; *Livingston Rock etc. Co.* v. *County of L.A.* (1954) 43 Cal.2d 121 [272 P.2d 4].)

■ When continuance of an existing use is permitted by a zoning ordinance, the continued nonconforming use must be similar to the use existing at the time the zoning ordinance became effective. (See *Rehfeld* v. *City and County of San Francisco* (1933) 218 Cal. 83 [21 P.2d 419]; *City of Yuba City* v. *Cherniavsky* (1931) 117 Cal.App. 568 [4 P.2d 299].) Intensification or expansion of the existing nonconforming use, or moving the operation to another location on the property is not permitted. (*County of San Diego* v. *McClurken, supra,* 37 Cal.2d 683, 687-688. See also 8A McQuillin, *supra,* § 25.206, p. 114.) "[I]n determining whether the nonconforming use was the same before and after the passage of a zoning ordinance, each case must stand on its own facts." (*Edmonds* v. *County of Los Angeles, supra,* 40 Cal.2d at 651 [255 P.2d 772]. See also *Livingston Rock etc. Co.* v. *County of L.A., supra,* 43 Cal.2d 121, 127; *City of La Mesa* v. *Tweed & Gambrell Mill* (1956) 146 Cal.App.2d 762, 768 [304 P.2d 803].)

Nonuse is not a nonconforming use, however, and reuse may be prohibited if a nonconforming use has been voluntarily abandoned. (*Hill* v. *City of Manhattan Beach, supra,* 6 Cal.3d 279, 286.)

B. *Vested rights to mining, quarrying, and other extractive uses—the "diminishing asset" doctrine.*

 In general, the state has the same power to prohibit the extraction or removal of natural products from the land as it does to prohibit other uses. (*Consolidated Rock Products Co.* v. *City of Los Angeles* (1962) 57 Cal.2d 515, 529 [20 Cal.Rptr. 638, 370 P.2d 342]; *Beverly Oil Co.* v. *City of Los Angeles, supra,* 40 Cal.2d 552, 558.)[16]

Unlike other nonconforming uses of property which operate within an existing structure or boundary, mining uses anticipate extension of mining into areas of the property that were not being exploited at the time a zoning change caused the use to be nonconforming. The question thus arises whether this extension is a prohibited expansion of a nonconforming use into another area of the property. In those jurisdictions which have considered the question, the answer is a qualified "no" under the "diminishing asset" doctrine, an exception to the rule banning expansion of a nonconforming use that is specific to mining enterprises.

When a mining or quarrying operation is a lawful nonconforming use, progression of the mining or quarrying activity into other areas of the property is not necessarily a prohibited expansion or change of location of the nonconforming use. When there is objective evidence of the owner's intent to expand a mining operation, and that intent existed at the time of the zoning change, the use may expand into the contemplated area. "The very nature and use of an extractive business contemplates the continuance of such use of the entire parcel of land as a whole, without limitation or restriction to the immediate area excavated at the time the ordinance was passed. A mineral extractive operation is susceptible of use and has value only in the place where the resources are found, and once the minerals are extracted it cannot again be used for that purpose. 'Quarry property is generally a one-use property. The rock must be quarried at the site where it exists, or not at all. An absolute prohibition, therefore, practically amounts to a taking of the property since it denies the owner the right to engage in the only business for which the land is fitted.' (*Morton* v. *Superior Court* [(1954)] 124 Cal.App.2d 577, 582 [269 P.2d 81, 47 A.L.R.2d 478]; *Lockard* v. *City of Los Angeles* [(1949)] 33 Cal.2d 453, 467 [202 P.2d

[16]*In re Kelso, supra,* 147 Cal. 609, which held that the police power did not extend to absolute prohibition of quarrying rock and stone from property in designated areas of the City and County of San Francisco, was decided before the constitutional validity of zoning ordinances was established by *Euclid* v. *Ambler Co., supra,* 272 U.S. 365. It and other cases decided before comprehensive zoning regulations was recognized as a constitutionally permissible exercise of the police power were effectively disapproved in *Consolidated Rock Products Co.* v. *City of Los Angeles, supra,* 57 Cal.2d 515, 528-529.

38, 7 A.L.R.2d 990]; *Trans-Oceanic Oil Corp.* v. *Santa Barbara* [(1948)] 85 Cal.App.2d 776, 789 [194 P.2d 148]; *Wheeler* v. *Gregg* [(1949)] 90 Cal.App.2d 348 [203 P.2d 37]; *Borough of Cheswick* v. *Bechman* [(1945)] 352 Pa. 79 [42 A.2d 60]; *Lamb* v. *A.D. McKee, Inc.* [(1932)] 10 N.J. Misc. 649 [160 A. 563]; *Village of Terrace Park* v. *Errett* [(6th Cir. 1926)] 12 F.2d 240, 243.) An entire tract is generally regarded as within the exemption of an existing nonconforming use, although the entire tract is not so used at the time of the passage or effective date of the zoning law." (*McCaslin* v. *City of Monterey Park, supra,* 163 Cal.App.2d 339, 349 (*McCaslin*).)

This rule is generally applicable in those states in which the question has arisen.[17] The Court of Appeals of New York recognized and applied the rule to a nonconforming use involving extraction of sand, gravel, topsoil, and fill from a 25-acre parcel of land in *Syracuse Aggregate Corp.* v. *Weise* (1980) 51 N.Y.2d 278 [434 N.Y.S.2d 150, 414 N.E.2d 651]. Rejecting a claim that the operation could not be extended into areas not yet excavated when the zoning was changed, the court explained: "By its very nature, quarrying involves a unique use of land. As opposed to other nonconforming uses in which the land is merely incidental to the activities conducted upon it . . . quarrying contemplates the excavation and sale of the corpus of the land itself as a resource. Depending on customer needs, the land will be gradually excavated in order to supply the various grades of sand and gravel demanded. Thus as a matter of practicality as well as economic necessity, a quarry operator will not excavate his entire parcel of land at once, but will leave areas in reserve, virtually untouched until they are actually needed.

"It is because of the unique realities of gravel mining that most courts which have addressed the particular issue involved herein have recognized that quarrying constitutes the use of land as a 'diminishing asset.' (See, e.g., *County of Du Page* v. *Elmhurst-Chicago Stone Co.* [(1960)] 18 Ill.2d 479, 165 N.E.2d 310.) Consequently, these courts have been nearly unanimous in holding that quarrying, as a nonconforming use, cannot be limited to the land actually excavated at the time of enactment of the restrictive ordinance because to do so would, in effect, deprive the landowner of his use of the property as a quarry." (*Syracuse Aggregate Corp.* v. *Weise, supra,* 414 N.E.2d 651, 654-655.)

The Supreme Court of Illinois recognized the "diminishing asset" doctrine in *County of Du Page* v. *Elmhurst-Chicago Stone Co.* (1960) 18 Ill.2d 479

---

[17]Exceptions are Massachusetts (*Town of Billerica* v. *Quinn* (1947) 320 Mass. 687 [71 N.E.2d 235]; *Town of Wayland* v. *Lee* (1950) 325 Mass. 637 [91 N.E.2d 835] [excavation permitted only from sand pit in use when ordinance adopted]) and Connecticut (*Teuscher* v. *Zoning Board of Appeals* (1967) 154 Conn. 650 [228 A.2d 518]).

[165 N.E.2d 310]. "This is not the usual case of a business conducted within buildings, nor is the land held merely as a site or location whereon the enterprise can be conducted indefinitely with existing facilities. In a quarrying business the land itself is a material or resource. It constitutes a diminishing asset and is consumed in the very process of use. Under such facts the ordinary concept of use, as applied in determining the existence of a nonconforming use, must yield to the realities of the business in question and the nature of its operations. We think that in cases of a diminishing asset the enterprise is 'using' all that land which contains the particular asset and which constitutes an integral part of the operation, notwithstanding the fact that a particular portion may not yet be under actual excavation. It is in the very nature of such business that reserve areas be maintained which are left vacant or devoted to incidental uses until they are needed. Obviously it cannot operate over an entire tract at once." (*Id.* at p. 313.)

The New Hampshire Supreme Court recognized that application of the normal restriction on expansion of a nonconforming use to a gravel pit would be a problem "because such use consumes the land and can only continue if allowed to expand" (*Flanagan* v. *Town of Hollis* (1972) 112 N.H. 222 [293 A.2d 328, 329]), but held that restriction of future expansion to a specified percentage of the area and to a depth no greater than that already excavated was reasonable. In *Hawkins* v. *Talbot* (1957) 248 Minn. 549 [80 N.W.2d 863, 865], the court recognized that a gravel pit was a "diminishing asset" and that if operation under a nonconforming use exception to a zoning ordinance prohibited expansion beyond the area already excavated, the ordinance would effectively prohibit any further use of the land. It held, as a matter of statutory construction, that such expansion was not precluded.

Other jurisdictions which recognize the "diminishing asset" exception to restricted expansion of nonconforming uses are Alaska (*Stephan & Sons* v. *Municipality of Anchorage* (Alaska 1984) 685 P.2d 98 [56 A.L.R.4th 761]), Utah (*Gibbons & Reed Company* v. *North Salt Lake City* (1967) 19 Utah.2d 329 [431 P.2d 559, 562-563]), New Jersey (*Moore* v. *Bridgewater Tp.* (1961) 69 N.J.Super. 1 [173 A.2d 430, 437]), and Wisconsin (*Smart* v. *Dane County Bd. of Adjustments* (1993) 177 Wis.2d 445 [501 N.W.2d 782, 785]).[18]

A vested right to quarry or excavate the entire area of a parcel on which the nonconforming use is recognized requires more than the use of a part of

---

[18]It is not clear whether Pennsylvania has adopted this approach. In *Borough of Cheswick* v. *Bechman* (1945) 352 Pa. 79 [42 A.2d 60], the court construed a local nonconforming use law as limiting new uses, but not expansion of existing uses. It then held that expansion of a sand and loam extraction business to the entire tract being used at the time a zoning ordinance became effective was permissible, stating that to deny the right of expansion would deprive the owners of the use of their property as effectively as a prohibition of all use would have done, and this could not have been the intent of the ordinance. (42 A.2d at p. 62.) But see *R. K. Kibblehouse* v. *Marlborough* (1993) 157 Pa.Commw. 630 [630 A.2d 937].

the property for that purpose when the zoning law becomes effective, however. In addition there must be evidence that the owner or operator at the time the use became nonconforming had exhibited an intent to extend the use to the entire property owned at that time. In *Syracuse Aggregate Corp.* v. *Weise, supra,* 414 N.E.2d 651, for example, the court concluded that the entire property could be used for quarrying because the "owner engage[d] in substantial quarrying activities on a distinct parcel of land over a long period of time and *these activities clearly manifest an intent to appropriate the entire parcel* to the particular business of quarrying . . . ." (*Id.* at p. 655, italics added.)

Similarly, in *Town of Wolfeboro (Planning Bd.)* v. *Smith* (1989) 131 N.H. 449 [556 A.2d 755], the court recognized extension of quarrying into additional areas of a parcel as a continuation, not an expansion, of a nonconforming use. However, construing the statute that permitted continuance of excavation as a nonconforming use, the court held that the " 'land area which is used' " for that purpose had to have been "clearly designated as an area for future excavation by an objective manifestation of the *intent of the excavator to continue an operation onto that particular land area.*" (*Id.* at p. 757, italics added.) The court summarized the applicable rule as follows: "In conclusion, we hold that a party who desires to continue excavation operations . . . must meet a three-pronged test: First, he must prove that excavation activities were actively being pursued when the law became effective; second, *he must prove that the area that he desires to excavate was clearly intended to be excavated, as measured by objective manifestations and not by subjective intent;* and third, he must prove that the continued operations do not, and/or will not, have a substantially different and adverse impact on the neighborhood." (*Id.* at p. 759, italics added.) In *Gibbons & Reed Company* v. *North Salt Lake City, supra,* 431 P.2d 559, the property had been used for roads and for stockpiling sand and gravel removed from other parcels. The owner testified that shortly before the enactment of the zoning ordinance, contracts for the removal of fill on the parcel had been negotiated; that at that time he intended to continue his gravel operations onto the parcel; and that 2,000,000 yards of gravel had been removed from the property. For those reasons the parcel was an integral part of the gravel operation before the zoning change was adopted and its use for that purpose thereafter was not an expansion of the use. (*Id.* at p. 564.) The area into which nonconforming quarrying operations could be extended in *Moore* v. *Bridgewater Tp., supra,* 173 A.2d 430, were only those into which the owner had manifested an objective intent to extend the operation. (*Id.* at p. 437.) And in *R. K. Kibblehouse* v. *Marlborough, supra,* 630 A.2d 937, 944, the court upheld denial of the right to quarry part of a tract because there was insufficient evidence that this area had been devoted to the nonconforming use.

In the most recent case applying this limitation, *Stephan & Sons* v. *Municipality of Anchorage, supra*, 685 P.2d 98, the Alaska Supreme Court summarized the scope of a vested right recognized under the diminishing asset doctrine, noting that the owner of a nonconforming use as a gravel pit does not necessarily have the right to use the entire tract. Rather, the use must " 'manifestly impl[y] that the entire property was appropriated to such use prior to adoption of the . . . ordinance.' " (685 P.2d at p. 102.)

"The rationale for the 'diminishing asset' doctrine is that the very nature of an excavating business is the continuing use of the land, and that this use is what is endorsed by the nonconforming use concept. Thus, the doctrine holds that 'an owner of a nonconforming use may sometimes be found to have a vested right to use an entire tract even though only a portion of the tract was used when the restrictive ordinance was enacted.' 6 R. Powell, The Law of Real Property [¶ 871[3][iii], at 79C-178 to -179 (Rohan rev. ed. 1979). The determining factor is 'whether the nature of the initial nonconforming use, in the light of the character and adaptability to such use of the entire parcel, manifestly implies that the entire property was appropriated to such use prior to adoption of the restrictive zoning ordinance.' [Citation.] The mere intention or hope on the part of the landowner to extend the use over the entire tract is insufficient; the intent must be objectively manifested by the present operations." (Fns. omitted.) (685 P.2d at pp. 101-102.)

The Anchorage zoning board had limited the owners of gravel pit operations to 13 acres of a 53-acre parcel. The Alaska Supreme Court noted that the operation had been on a relatively small scale at the time the ordinance was enacted, and even four years later extended only to two to five acres. On that basis the court concluded that the evidence "in no way manifestly indicated an objective intent to appropriate the entire [parcel]" (685 P.2d at p. 102), and affirmed the superior court judgment which had upheld that ruling.

The right to expand mining or quarrying operations on the property is limited by the extent that the particular material is being excavated when the zoning law became effective. Thus, in *County of Du Page* v. *Elmhurst-Chicago Stone Co., supra*, 165 N.E.2d 310, while the court applied the "diminishing asset" doctrine to a parcel of land from which aggregate was mined, it described the rule as permitting use of all the land "which contains the particular asset and which constitutes an integral part of the operation," (*id.* at p. 313) and held that the owner was using all of its 40-acre tract which contained gravel and aggregate, notwithstanding the fact that the entire tract was not yet under excavation. (*Ibid.*)

Finally, a lawful nonconforming use may not be extended to adjacent property acquired after the zoning change went into effect except to the

extent that the transferors of the property themselves had a vested right to engage in that nonconforming use on the transferred property. The court recognized this in *McCaslin* where it stated: "Of course, plaintiff's nonconforming use of the property in question cannot be expanded or extended to a separate parcel . . . ." (*McCaslin, supra,* 163 Cal.App.2d at p. 350.) In that case the applicable zoning ordinance contained that restriction (*id.* at p. 344), but that is the rule of general application. (See 8A McQuillin, *supra,* § 25.208, p. 128, and cases cited.) In another quarrying case, a New Jersey court held that even though the quarry owner had been permitted by the previous owner of an adjacent tract to carry equipment across the adjacent tract, quarrying was not being conducted on that tract. Therefore when the quarry owner acquired the tract after a zoning change went into effect, the nonconforming quarry operation could not be extended onto the new tract. "The use at the time the ordinance was adopted established the non-conforming use which defendant was entitled to continue." (*Struyk* v. *Samuel Braen's Sons* (1951) 17 N.J.Super. 1 [85 A.2d 279, 281].)

Even where multiple parcels are in the same ownership at the time a zoning law renders mining use nonconforming, extension of the use into parcels not being mined at that time is allowed only if the parcels had been part of the mining operation. (*Dolomite Products Company* v. *Kipers* (1965) 23 A.D.2d 339 [260 N.Y.S.2d 918] affd. 19 N.Y.2d 739 [279 N.Y.S.2d 192, 225 N.Ed.2d 894] [owner may not "tack" a nonconforming use on one parcel used for quarrying onto others owned and held for future use when the zoning law became effective]; *Smart* v. *Dane County Bd. of Adjustments, supra,* 501 N.W.2d 782 [mining may be expanded to contiguous parcel owned by same entity, if excavation operations were in existence on part of the land, and all of the land constituting an integral part of the operation was "in use" when the zoning change occurred]; *Stephan & Sons* v. *Municipality of Anchorage, supra,* 685 P.2d at p. 102, fn. 6 ["The diminishing asset doctrine normally will not countenance the extension of a use beyond the boundaries of the tract on which the use was initiated when the applicable zoning law went into effect. *See* 4 A. Rathkopf, The Law of Zoning and Planning § 51.07[4][a] (4th ed. 1983); *see also Midland Park Coal & Lumber Co.* v. *Terhune,* 56 A.2d 717 (N.J. 1948); *Syracuse Aggregate Corp.* v. *Weise,* 51 N.Y.2d 278, 434 N.Y.S.2d 150, 414 N.E.2d 651, 655 (1980); *Davis* v. *Miller,* 163 Ohio St. 91, 126 N.E.2d 49, 51 (1955)."].)

Were the rule otherwise, zoning laws could be easily avoided by acquiring property abutting a tract on which the nonconforming use operated and expanding into the new property, even though the original owners of the newly acquired property had no vested right to such use of the property.

Amici curiae counties and cities argue, notwithstanding *McCaslin*, that the diminishing asset doctrine is not the law of California. Their only basis for this suggestion, however, is that the decision was distinguished by the Court of Appeal in *Paramount Rock Co.* v. *County of San Diego* (1960) 180 Cal.App.2d 217, 228 [4 Cal.Rptr. 317]; but *Paramount Rock* did not question the applicability of the doctrine to extractive uses. Instead, the court distinguished the case before it on the ground that the owner sought to build a plant for, and commence a rock crushing operation on, land that theretofore had been used only for extraction of sand and premixing of materials for ready-mix concrete. That proposed operation was not one that is substantially the same as the use to which the property had been put before the zoning ordinance became applicable.

In the absence of any basis for concluding that a zoning ordinance, which permits the continuation of nonconforming uses, intended its ban on expansion to other areas of the property to apply to mining uses, *McCaslin* provides the applicable rule. The *McCaslin* court's application of the diminishing asset doctrine there is entirely consistent with this court's recognition, in *Lockard* v. *City of Los Angeles* (1949) 33 Cal.2d 453, 467 [202 P.2d 38, 7 A.L.R.2d 990], that "[s]uch a business must operate, if at all, where the resources are found." If it may not expand, it cannot continue. ▮ Recognition of the diminishing asset doctrine is also consistent with the legislative intent underlying SMARA, which seeks to minimize ecological degradation from mining enterprises. Were the diminishing asset doctrine inapplicable, a mining enterprise would be required to immediately initiate mining on all areas of its property lest, under a subsequent zoning change, its right to further mining be extinguished.

## IV

### Application to the Bear's Elbow Mine

▮ Because the administrative decision denying approval of Hansen Brothers' reclamation plan effectively precludes continuance of the company's aggregate production business unless it applies for and is granted a conditional use permit by the county, the superior court properly exercised its independent judgment in making factual determinations based on the administrative record. (*Strumsky* v. *San Diego County Employees Retirement Assn.*, *supra*, 11 Cal.3d 28, 34-35; see *Halaco Engineering Co.* v. *South Central Coast Regional Com.*, *supra*, 42 Cal.3d 52, 63-66.) Those findings must be upheld on appeal from the superior court judgment if they are supported by substantial evidence. (*Yakov* v. *Board of Medical Examiners* (1968) 68 Cal.2d 67, 71 [64 Cal.Rptr. 785, 435 P.2d 553]; *Moran* v. *Board of*

*Medical Examiners* (1948) 32 Cal.2d 301, 308 [196 P.2d 20]; *McMillen* v. *Civil Service Com.* (1992) 6 Cal.App.4th 125, 129 [8 Cal.Rptr.2d 548].)

As to the issues on which the evidence in the administrative record is undisputed, however, the ultimate conclusion to be drawn from the evidence is a question of law. (*Halaco Engineering Co.* v. *South Coast Central Regional Com., supra,* 42 Cal.3d 52, 74.)

Hansen Brothers argues that under *McCaslin* it has a right to mine and quarry the entire 60 acres of its Nevada County property.[19] The Court of Appeal, it contends, failed to properly apply the law governing nonconforming uses and the diminishing asset doctrine to its operation of the Bear's Elbow Mine. Hansen Brothers claims that since 1946 the Bear's Elbow Mine has been an "integrated" mining operation. It asserts that this includes not only the riverbed mining and hillside quarrying on which the lower courts and the county agencies focused, but also the on-site conveyance, crushing, sorting, washing, storage, and transportation of the mined product. It claims, in essence, that the proper focus of the nonconforming use question is not on the discrete mining operations, but on the conduct of the aggregate production business. On that basis it argues that the Court of Appeal erred in concluding (1) that quarrying the hillside was a separate "use" of the property, (2) that this use of the property had been discontinued, and (3) that even if Hansen Brothers had a vested right to quarry the hillside, the operation proposed in the SMARA application was an impermissible intensification and enlargement of the lawful nonconforming mining operation which Hansen Brothers had a vested right to continue notwithstanding the 1954 zoning ordinance. We shall address each question in turn. First, however, we must consider whether those rights that Hansen Brothers may have extend to the entire 60 plus acres that are identified on its SMARA reclamation plan as the Bear's Elbow Mine.

A. *Extent of Bear's Elbow Mine in 1954.*

■ As we have noted earlier, a vested right to continue a nonconforming use extends only to the property on which the use existed at the time zoning regulations changed and the use became a nonconforming use.

---

[19]Hansen Brothers asserts that this right exists as a matter of constitutional law. Whether there has been or may be a compensable taking of any part of its property is not an issue in this proceeding. Because the issues in the petition for writ of mandate would be dispositive of other counts in its complaint alleging inverse condemnation and seeking declaratory relief, trial of its claim that it is exempt from the permit requirement of the Nevada County Land Use and Development Code was bifurcated from the other counts. To expedite review of the superior court judgment denying the petition for writ of mandate, Hansen Brothers dismissed the remaining causes of action. As a result, there has been no adjudication of its inverse condemnation claim.

Undisputed evidence in the record establishes, and the county concedes, that Hansen Brothers and its predecessors in interest operated the aggregate production business at the Bear's Elbow Mine in 1954 at the time the Nevada County zoning ordinance was enacted. Hansen Brothers argues that it is also undisputed that its Nevada County property is a 60-acre property.

Hansen Brothers is correct in its assertion that there is no dispute that it owns contiguous parcels of Nevada County property, including that on which the Bear's Elbow Mine was established in 1946, and that those parcels total 60 acres. Some of those parcels were conveyed to Hansen Brothers after 1954, however. The record does not confirm that all of the parcels, over which Hansen Brothers claimed vested mining rights in its SMARA application, were part of the Bear's Elbow Mine in 1946 or 1954. The record is also devoid of evidence that the owners of those parcels themselves held vested mining rights in the transferred property at the time they were deeded to Hansen Brothers. Examination of the record reveals that while the county has admitted that Hansen Brothers and its predecessors in interest have been conducting mining operations at the Bear's Elbow Mine since 1946, that admission encompassed only the parcel that was the original site of the Bear's Elbow Mine and one of the three parcels conveyed to Hansen Brothers after 1954.

The petition for writ of mandate in this matter alleged that "at all times herein mentioned, petitioner has conducted a mining operation, more particularly described as quarrying and mining aggregate. Hansen has conducted mining of rock, sand and gravel for aggregate on the subject property since 1946 and has owned and operated the mine since 1954. That aggregate mining operation includes, but is not limited to the quarrying from the river and from the hillside on the subject property . . . ." The "subject property" was identified as that described in exhibit A to the petition.

Exhibit A to the petition consists of copies of three documents:

(1) A deed by A.A. Viscia and Edna Viscia conveying a parcel of Nevada County property to Hansen Brothers in 1968. The record contains no evidence that this parcel was part of the Bear's Elbow Mine in 1954 or that the grantees had vested mining rights on that parcel in 1954, and continued to have such rights in 1968 when the tract was conveyed to Hansen Brothers. However, this deed was part of exhibit A to Hansen Brothers' second amended petition for writ of mandate, which alleged that Hansen Brothers had conducted mining operations on the "subject property" described in exhibit A.

The county admitted in its response to the petition that Hansen Brothers "is, and since September 21, 1954, has been, the owner of the property

described in Exhibit A ('The subject property'); Petitioner has conducted a mining operation on the subject property since 1946 which, at various times, has included the in-the-riverbed extraction of aggregate and hillside quarrying of rock, together with processing, storage and sale of the mined materials on site, including activities related thereto."[20]

Inasmuch as the county admitted that Hansen Brothers was using this property in its Bear's Elbow Mine business in 1954, it must be included in the area over which Hansen Brothers' aggregate mining rights vested. The property description indicates that this parcel is less than three acres in size.

(2) A deed dated July 22, 1982, from Arlie Hansen and Sibley Hansen quitclaiming to Hansen Brothers the "Patented mining claim known as the Bears Elbow Placer Mining Claim, located on a portion of Section 32, Township 15 North, Range 9 East, Mount Diablo Meridian, Colfax Mining District, Nevada County and Placer County, more particularly described in that certain patent granted July 14, 1981, recorded in the official records of Nevada County on September 2, 1981 document number 81, 23586, and recorded in the official records of Placer County on October 16, 1981, recording number 40517."

(3) The July 14, 1981, United States Land Patent to Arlie Hansen and Karsten Hansen for the Bear's Elbow Placer Mining Claim described above, with accompanying field notes. The deed recited that the "premises herein granted contain 28.898 acres."[21]

Other documents in the record confirm that the Bear's Elbow Placer Mining Claim was the claim located by Vollmer and Rondini in 1945 and operated by Hansen Brothers' predecessors in interest in 1954 when the zoning ordinance was enacted. These 2 properties cover only 32 acres, however, not the 60-plus acres identified in Hansen Brothers' SMARA application.

The SMARA application was accompanied by copies of deeds to Hansen Brothers for two additional parcels, but as those properties were not identified in the petition for writ of mandate, the county did not admit that they

---

[20]The county also conceded that Hansen Brothers' "surface mining operations on the subject property predating regulation thereof entitle it to a right to continue the same without substantial change as a nonconforming use . . . , but deny that the hillside quarry operation qualifies for such treatment, though the in-the-riverbed extraction operation may."

The county offers no explanation for its apparently inconsistent position on riverbed mining which has also been discontinued for periods in excess of 180 days.

[21]For a brief description of the authority for and procedure to obtain a mining claim and land patent see *California Coastal Comm'n* v. *Granite Rock Co.* (1987) 480 U.S. 572, 575-576 [94 L.Ed.2d 577, 588-589, 107 S.Ct. 1419].

had been part of the Bear's Elbow Mine in 1954 and the record does not otherwise demonstrate that either Hansen Brothers or its predecessors in interest had vested mining rights on those parcels at that time.[22]

In response to the court's request for supplemental briefing on the extent of the property operated as a mine in 1954, the county confirmed that Nevada County records establish that the sixty-seven-acre parcel Hansen Brothers now describes as the Bear's Elbow Mine is in fact comprised of four separate parcels, three of which were conveyed to Hansen Brothers after 1954. The county argues on that basis and in light of the absence of evidence that lawful nonconforming mining use existed on the three after-acquired parcels in 1954, that, even if Hansen Brothers has a right to quarry rock from the hillside (which it disputes), that right cannot extend beyond the boundaries of the original twenty-eight-acre parcel.

Hansen Brothers does not dispute the absence of evidence in the record that the after-acquired properties were being used for mining purposes in 1954. Instead it argues that its SMARA reclamation plan describes the property as consisting of various parcels totaling 60 acres in Nevada County. It also seeks to rely on the Board's finding that it has been allowed to continue a legal nonconforming use on that property since adoption of the zoning ordinance, and on the Board's failure to contest earlier that it has a right to continue that nonconforming use. It argues in effect that the county is either estopped to argue before this court that the entire 67 acres was not owned and operated as part of the Bear's Elbow Mine in 1954, or that the county has waived that claim.

However, as Hansen Brothers has acknowledged, the facts related to the acreage owned and operated as a mine in 1954 are undisputed. Therefore, the Board's findings of fact are not determinative. The court must make its own decision as to the legal impact of those facts and is not bound by any concessions of law that a party may have made. (*Greener* v. *Workers' Comp. Appeals Bd.* (1993) 6 Cal.4th 1028, 1043, fn. 11 [25 Cal.Rptr.2d 539, 863

---

[22]Those parcels are: (1) A United States Land Patent (No. 04-85-00067) conveying 2.50 acres of land "embraced within the Bears Elbow Mill [*sic*] Site claim" to Hansen Brothers on December 26, 1984. This parcel appears to have been part of the original 1945 claim, but the record contains no evidence that it remained so in 1954 or 1984.

(2) A grant deed from Willow Creek Enterprises to Hansen Brothers Enterprises, Inc., dated May 21, 1970, describing the property as "Lot 1 of Willow Creek Acres as shown on the Official Map thereof filed in the Office of the County Recorder of the County of Nevada . . . ." Willow Creek Acres is north of the mining site and has parcels ranging from five to twenty acres in size. There is no evidence in the record that Willow Creek Enterprises held vested mining rights in this parcel at the time of the transfer, or that either of these parcels was being used for mining purposes in 1954.

P.2d 784].) Indeed, the county lacks the power to waive or consent to violation of the zoning law. (*City of Fontana* v. *Atkinson* (1963) 212 Cal.App.2d 499, 507-508 [28 Cal.Rptr. 25]; *Western Surgical Supply Co.* v. *Affleck* (1952) 110 Cal.App.2d 388 [242 P.2d 929].)

 Even were there an equitable basis for claiming an estoppel to assert the applicability of a zoning ordinance to property in some circumstances (see *City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462, 493 [91 Cal.Rptr. 23, 476 P.2d 423]), no basis for doing so appears in this case as there is no evidence of detrimental reliance on the Board's failure to note the dates of acquisition of the three parcels Hansen Brothers now claims are all part of the Bear's Elbow Mine. "[T]he owner of property or one proposing to acquire it cannot justify his ignorance of the true state of the facts and the law affecting it by pointing to similar ignorance in government bodies. Negligence which may be less than culpable in a government body, charged with the administration and regulation of vast amounts of land under diverse ownership, cannot be so easily excused in one whose interest is focused on a particular piece of property." (*County of Los Angeles* v. *Berk* (1980) 26 Cal.3d 201, 221 [161 Cal.Rptr. 742, 605 P.2d 381].) Moreover, estoppel will not be recognized "when to do so would nullify 'a strong rule of policy adopted for the benefit of the public . . . .' " (*Id.* at p. 222; see also *City of Long Beach* v. *Mansell, supra,* 3 Cal.3d 462, 496-497.)

The evidence therefore establishes only that whatever vested rights to mine and quarry its property Hansen Brothers has exist on the 28.898-acre placer mining claim patented to its predecessors and conveyed to it in 1982, and on the 3-acre Viscia parcel which the county admitted in its response to the petition was operated as part of the mine in 1954.

"The burden of proof is on the party asserting a right to a nonconforming use to establish *the lawful* and continuing existence of the use at the time of the enactment of the ordinance." (*Melton* v. *City of San Pablo* (1967) 252 Cal.App.2d 794, 804 [61 Cal.Rptr. 29].) Hansen Brothers has failed to carry that burden insofar as its SMARA reclamation plan asserted a vested right to quarry a 60-plus-acre parcel of Nevada County land. The evidence is insufficient to support a finding that Hansen Brothers is entitled to a writ of mandate to compel the Board to approve its SMARA reclamation plan as presented.[23] Before that question can be resolved, the extent of the property on which Hansen Brothers may assert the right to continue a nonconforming use must be determined by the superior court on remand.

---

[23]Our conclusion that Hansen Brothers has not established a right to mine the entire 60 acres covered by its SMARA reclamation plan does not preclude submission of a revised plan or new hearing on the present plan at which evidence may be presented on whether the

## B. *Separate use.*

We next address the nature of the use to which the Hansen Brothers' property was being put in 1954 when that use became nonconforming. The Court of Appeal, superior court, and administrative bodies concluded that Hansen Brothers' riverbed gravel mining and hillside rock quarrying operations were separate and that quarrying had been discontinued for a period in excess of the 180-day limit for nonconforming uses established by the zoning ordinance. Hansen Brothers argues that its placer mining and rock quarrying operations are part of a "single use" of its property for the production of aggregate. We agree. In 1954, when the zoning ordinance was adopted, Hansen Brothers' predecessors were using the Bear's Elbow Mine property for an aggregate production and sale business. Mining for sand and gravel and quarrying for rock were integral parts of that business. Contrary to the conclusion of Justice Mosk and Justice Kennard, the nonconforming use of the property was not and is not simply mining in which riverbed mining and rock quarrying were separate uses of the property. The evidence, which neither Justice Kennard nor Justice Mosk mentions, is undisputed. The nonconforming use of the property has always been the operation of an aggregate production business, of which mining for the components is an aspect. We agree that the findings of the superior court and the Board that rock quarrying has been discontinued for periods in excess of 180 days, and when operating has produced smaller quantities of material than the riverbed mining, are supported by substantial evidence. Those findings are not dispositive, however, because both the Board and the superior court proceeded on the erroneous premise that the unitary nonconforming use of the property for the production of aggregate could be compartmentalized into two mining uses and an aggregate production business.

In determining the use to which the land was being put at the time the use became nonconforming, the overall business operation must be considered. "[O]*ne entitled to a nonconforming use has a right to . . . engage in uses normally incidental and auxiliary to the nonconforming use . . . .* Furthermore, open areas in connection with an improvement existing at the time of the adoption of zoning regulations are exempt from such regulations as a nonconforming use if such open areas were in use or partially used in

previous owners of the 2 remaining parcels had vested mining rights on those parcels at the time they were conveyed to Hansen Brothers.

Because the record does not support the existence of such rights on the entire 60 acres, however, our conclusions here with regard to Hansen Brothers' vested rights to operate the Bear's Elbow Mine refer only to the 2 parcels over which Hansen Brothers has established vested rights.

connection with the use existing when the regulations were adopted." (8A McQuillin, *supra*, at § 25.200, p. 89, italics added.) The mining uses of the Hansen Brothers' property are incidental aspects of the aggregate production business.

 In the context of a business like that operated by Hansen Brothers, this approach is illustrated in *Paramount Rock Co. v. County of San Diego*, *supra*, 180 Cal.App.2d 217. There, at the time the land in issue was rezoned, the lessee was operating a ready-mix concrete business. Sand was removed on the premises, washed elsewhere, and returned to the site, where it was mixed with rock, gravel, and cement and loaded into trucks equipped to add water and mix the materials to form concrete. After the land was rezoned, the lessee constructed a rock-crushing plant on the site. The county successfully sought to enjoin operation of the rock crushing plant, which the lessee claimed was an integral part of its pre-mix concrete business.

The Court of Appeal affirmed the judgment granting relief to the County, rejecting the claim that the rock-crushing plant was an integral part of the business the plaintiff had been operating, and holding that the plant was not a part of the nonconforming use to which the property was being put at the time the zoning ordinance was adopted. (*Paramount Rock Co. v. County of San Diego*, *supra*, 180 Cal.App.2d 217, 230.) The court noted, however, that under the ordinance the lessee was entitled to operate the pre-mix business, including the sand pit.

Construing a local ordinance in *State v. Bumgarner* (1959) 110 Ohio App. 173 [12 Ohio Ops.2d 434, 168 N.E.2d 901], the Ohio Court of Appeals reached a similar conclusion, holding that a nonconforming use in issue there was mining, quarrying, and processing limestone, including the use of all structures necessary or incidental thereto.

We have found no authority for refusing to recognize a vested right to continue a component of a business that itself has a vested right to continue using the land on which it is located for operation of the business. An aggregate business does not differ from other land uses simply because mining for some or all of the materials that comprise aggregate is a component of the business. Unless an independent aspect of the business has been discontinued, the use may not be broken down into component parts and vested rights recognized for less than the entire business operation.

We recognize that the placer mining operation recovers sand and gravel from a riverbed and its banks, while the quarrying operation will recover hard rock from a hillside that rises at a distance of several hundred yards from the river. These components differ and are not part of a single deposit

or lode. The mining and quarrying methods also differ. Nonetheless, the use of the land at the time the Nevada County zoning ordinance became effective was for aggregate production and sale. The aggregate was not being produced only from sand and gravel taken from the riverbed. The evidence that rock was being taken from the hillside as needed to produce aggregate in 1954 is undisputed.[24]

The land on which the mine operates was originally claimed as a placer mine.[25] Although the record does not include documents that establish that hard rock was to be recovered or extracted under the placer mining claim, the patent recites that the owners were granted a right to extract rock from the 29 acres covered by the patent.[26]

---

[24]Arlie Hansen, one of the original owners of the Bear's Elbow Mine, testified that he had worked at the mine since 1946 and had owned it since 1954. When asked at the hearing before the Board whether "as long as you have been associated with it, do you take material from both the hillside and river bed to form the aggregate that you produce and sell," he responded unequivocally: "Yes, we do."

[25]A "placer," as distinguished from a "lode" or "vein" for which a mining claim may be made, is " 'a gravelly place where gold is found, especially by the side of a river, or in the bed of a mountain torrent.' Whatever the origin of the subterranean channels containing gravel beds, they have long been known to exist in California, and they have been generally supposed to be, and generally spoken of, as the beds of ancient rivers in which the gravel was deposited by fluvial action, and which were either from their beginning subterranean, or upon which the superincumbent earth or rock has been hurled, by means of convulsion, caused by volcanic or other natural force." (*Gregory* v. *Pershbaker* (1887) 73 Cal. 109, 114 [14 P. 401].) " '[C]laims usually called placers' are declared to include all forms of deposit, 'excepting veins of quartz or other rock in place.' " (*Id.* at p. 115.) " 'A fissure in the earth's crust, an opening in its rocks and strata made by some force of nature, in which the mineral is deposited, would seem to be essential to a lode in the judgment of geologists. But to the practical miner the fissure and its walls are only of importance as indicating the boundaries within which he may look for and reasonably expect to find the ore he seeks. A continuous body of mineralized rock lying within any other well-defined boundaries on the earth's surface, and under it, would equally constitute, in his eyes, a lode. We are of [the] opinion, therefore, that the term as used in the acts of congress is applicable to any zone or belt of mineralized rock lying within boundaries clearly separating it from the neighboring rock.' " (*Pepperdine* v. *Keys* (1961) 198 Cal.App.2d 25, 35-36 [17 Cal.Rptr. 709].)
" ' "[T]he two essential elements of a lode are (a) the mineral-bearing rock, which must be in place and have reasonable trend and continuity, and (b) the reasonably distinct boundaries on each side of the same." ' ([Citing *Titanium Actynite Industries* v. *McLennan* (10th Cir. 1959) 272 F.2d 667, 670.] See also Lindley on Mines, vol. 1 (3d ed.) § 289; *Gregory* v. *Pershbaker*, 73 Cal. 109, 111-114 [14 P. 401]; American Mining Law, California Natural Resources Department, vol. 1, pp. 140-141.)" (*Pepperdine* v. *Keys, supra*, 198 Cal.App.2d at p. 36.)

[26]The claim may have been made pursuant to the Stone Land Placer Claim Act, an 1892 supplement to the federal law permitting exploration for valuable mineral deposits on public lands (30 U.S.C. § 22), which provided: "That any person authorized to enter lands under the mining laws of the United States may enter lands that are chiefly valuable for building stone under the provisions of the law in relation to placer mineral claims. . . ." (Act of Aug. 4,

Therefore, the evidence does not support the finding of the superior court that Hansen Brothers did not have a vested right to quarry rock from the hillsides of the Bear's Elbow Mine as it existed in 1954. The record establishes, instead, that rock was being taken from the hillsides at that time as an integral part of the aggregate business. However, the parties offered no other evidence regarding, and neither the administrative bodies nor the superior court made findings on, whether " 'the nature of the initial nonconforming use, in the light of the character and adaptability to such use of the entire parcel, manifestly implies that the entire [mine] property was appropriated to [mining and quarrying] use prior to adoption of the restrictive zoning ordinance.' " (*Stephan & Sons* v. *Municipality of Anchorage, supra,* 685 P.2d at p. 102.) This question too must be addressed on remand before a ruling is made on Hansen Brothers' SMARA plan since resolution of that question is crucial to a determination of the extent of Hansen Brothers' vested mining rights.

### C. *Discontinuance of use.*

 Article 29, section L-II 29.2(B) (hereafter Development Code section 29.2(B)) of the Nevada County Land Use and Development Code provides: "If the nonconforming use is discontinued for a period of one hundred eighty (180) days or more, any following use shall be in conformity with all applicable requirements of this Chapter." Provisions like this further the purpose of zoning laws which seek to eliminate nonconforming uses. "The ultimate purpose of zoning is . . . to reduce all nonconforming uses within the zone to conformity as speedily as is consistent with proper safeguards for the interests of those affected." (*Dienelt* v. *County of Monterey* (1952) 113 Cal.App.2d 128, 131 [247 P.2d 925].) We have recognized that, given this purpose, courts should follow a strict policy against extension or expansion of those uses. (*County of San Diego* v. *McClurken, supra,* 37 Cal.2d 683, 687.) That policy necessarily applies to attempts to continue nonconforming uses which have ceased operation. In construing an ordinance which limits continuation of nonconforming uses, however, the court

1892, ch. 375, § 1, 27 Stat. 348; 30 U.S.C. § 161.) That law was effectively repealed in part in 1955 when an additional statute was enacted, which provided that deposits of "common varieties of sand, stone, gravel, pumice, pumicite, or cinders shall not be deemed a valuable mineral deposit within the meaning of the mining laws of the United States so as to give effective validity to any mining claim hereafter located under such mining laws . . . . 'Common varieties' as used in this Act does not include deposits of such materials which are valuable because the deposit has some property giving it distinct and special value." (Act of July 23, 1955, ch. 375, § 3, Pub.L. No. 84-167, § 3, 69 Stat. 368; 30 U.S.C. § 611.)

To be valuable in an economic sense within the meaning of the federal law, the stone must have been marketable when the claim was made, i.e., the price it would bring exceeded the cost of extraction. (*United States* v. *Coleman* (1968) 390 U.S. 599 [20 L.Ed.2d 170, 88 S.Ct. 1327].)

must also assume that the county did not intend an arbitrary or irrational application of its provisions.

The term "discontinued" in a zoning regulation dealing with a nonconforming use is sometimes deemed to be synonymous with "abandoned." Cessation of use alone does not constitute abandonment. "[A]bandonment of a nonconforming use ordinarily depends upon a concurrence of two factors: (1) An intention to abandon; and (2) an overt act, or failure to act, which carries the implication the owner does not claim or retain any interest in the right to the nonconforming use (8A McQuillin, [*supra*], § 25.192; 1 Anderson, American Law of Zoning, § 6.58). Mere cessation of use does not of itself amount to abandonment although the duration of nonuse may be a factor in determining whether the nonconforming use has been abandoned (101 C.J.S. Zoning § 199)." (*Union Quarries, Inc.* v. *Board of County Com'rs* (1970) 206 Kan. 268 [478 P.2d 181, 186-187].) In *Southern Equipment Co.* v. *Winstead* (1986) 80 N.C.App. 526 [342 S.E.2d 524], the court held that under the applicable ordinance the failure to operate a concrete mixing facility for six months during a business slowdown, while the operator filled orders from another plant, was not a cessation of operation. There, as in this case, the plant, equipment, inventory, and utilities were maintained throughout the period and the plant could be made operational within two hours.

This court has also equated discontinuance of a nonconforming use with voluntary abandonment (see *Hill* v. *City of Manhattan Beach, supra*, 6 Cal.3d 279, 286), but we have never expressly held that the terms are synonymous. Although abandonment of a nonconforming use terminates it in all jurisdictions (8A McQuillin, *supra*, § 25.191, p. 68), ordinances or statutes which provide that discontinuance of a nonconforming use terminates it have not been uniformly construed. Some have been held to create a presumption of abandonment by nonuse for the statutory period, others considered to be evidence of abandonment. In still other jurisdictions the nonconforming use is terminated when the specified period of nonuse occurs, regardless of the intent of the landowner. (*Id.* at pp. 68-69.) As we have noted, the parties have not offered any evidence of the legislative understanding or intent underlying the use of the term "discontinued" in Development Code section 29.2(B).[27]

 The superior court treated quarrying as a separate operation and decided the cessation question based only on actual inactivity at the quarry without regard to the continuing aggregate business and without considering

---

[27]The county argues that its "zoning ordinance relies upon abandonment by non-use to phase out the non conforming [*sic*] use. . . ." We hesitate to read this as a concession that "discontinued" as used in Development Code section 29.2(B) means voluntary and intentional abandonment.

intent to abandon. The evidence supports the court's finding that quarrying was discontinued for periods in excess of 180 days. As we have noted earlier, however, the county admitted that Hansen Brothers "has conducted a mining operation on the subject property since 1946 which at various times, has included in-the-river-bed extraction of aggregate and hillside quarrying of rock, together with processing, storage and sale of the mine materials on site, including activities related thereto. . . ." The county has thus conceded that the aggregate business has not been discontinued, and the evidence supports the superior court's finding on that point.

The county argues nonetheless that Hansen Brothers has lost any right it might have had to quarry rock from the hillside because that aspect of the business has been discontinued for periods in excess of the 180 days permitted under the zoning ordinance for nonconforming uses.[28] We have concluded, however, that the nonconforming use which Hansen Brothers had a right to continue is the aggregate production and sale business and that rock quarrying is an integral part of that business. Therefore, since the aggregate business itself has not been discontinued, Hansen Brothers has not lost the right to future quarrying on its property as necessary to its production of aggregate. The 180-day provision applies to the nonconforming use itself, not to the various components of the business.[29]

---

[28] Again the county's position seems inconsistent with its avowed purpose to minimize site degradation. Were the operations treated separately, we would encourage continuous and unnecessary hillside quarrying to retain the right to exploit that area even at times when riverbed gravel, a replenishing resource, was adequate to meet the needs of the aggregate business.

[29] We would not conclude, for instance, that a dairy business operating as a nonconforming use with facilities for bottling milk and making and storing butter, had discontinued and thus lost the right to resume butter manufacturing for several months when the demand for butter was low, stored butter was adequate to meet the need, and the dairy used its cream for other purposes.

Even were the rock quarry a separate operation, however, it is not at all clear that the ordinance should be construed as terminating a nonconforming mining use when the mined material is stored and being used as needed, with mining renewed only as necessary to replenish the stockpile.

The parties have offered no evidence of how the county intended its 180-day limitation to apply to mining operations in these circumstances. Were we to construe the Nevada County ordinance as terminating a nonconforming mining use whenever mining ceased for 180 days even though the mined material was being stored and used as necessary, we would have to assume that the county contemplated that the property would lose its nonconforming use status unless mining operations were renewed every 6 months whether or not additional material was needed. The result in an operation like that of Hansen Brothers would be unnecessary blasting and degradation of the site in order to retain the right to continue a nonconforming use, instead of occasional extraction of rock as needed.

We hesitate to attribute that intent to the county, and the language of the ordinance does not compel that result.

Since we have concluded that the aggregate mining, production, and sales business was the land use for which Hansen Brothers had a vested right in 1954, the fact that rock quarrying may have been discontinued for 180 days or more is irrelevant. Hansen Brothers has a vested right to continue all aspects of its aggregate business at the Bear's Elbow Mine. This is not to say that future inactivity at the mine may not result in termination of that vested right or that the county might not conclude that the property is no longer being used for aggregate production, and is currently in use only as a yard for storage and sales of stockpiled material.[30]

### D. *Expansion or intensification of use.*

The final question is whether substantial evidence supports the finding that Hansen Brothers' proposal for future quarrying would be an impermissible intensification of its nonconforming use.

As is customary in zoning ordinances, the Nevada County ordinance provides in article 29, section L-II 29.2(A) of the Land Use and Development Code (Development Code section 29.2(A)): "No such [nonconforming] use shall be enlarged or intensified."

Relying on Development Code section 29.2(A), the county argues that quarrying operations on the scale proposed in the SMARA application would be an impermissible intensification of the nonconforming use. Therefore Hansen Brothers may not undertake the mining proposed in the SMARA application without applying for and obtaining a conditional use permit.

Our conclusion that Hansen Brothers continues to have a vested right to continue quarrying hard rock for use in making aggregate does not compel a conclusion that this right extends to quarrying the amount of rock proposed in its SMARA proposal. "Given the objective of zoning to eliminate nonconforming uses, courts throughout the country generally follow a strict

---

[30]Because the county has conceded that Hansen Brothers continues to have a vested right to operate its business on the Bear's Elbow Mine site, we need not decide now whether Development Code section 29.2(B) is intended to automatically terminate all nonconforming uses whenever the use has ceased for 180 days, or if it does so only if the use has been voluntarily abandoned for that period. We observe, however, that the business of aggregate mining and sale in Nevada County is necessarily seasonal and dependent on fluctuating market demand. Faced with similar questions in applying laws terminating lawful nonconforming uses to quarrying operations, both the Kansas Supreme Court in *Union Quarries, Inc.* v. *Board of County Com'rs, supra,* 478 P.2d 181, and the Oregon Supreme Court in *F.O. Bither* v. *Baker Rock Crushing Co.* (1968) 249 Or. 640 [438 P.2d 988], held that when quarried rock was stockpiled and sales were being made from those stockpiles there was no abandonment or discontinuance of use of the property for quarrying even though there had been no quarrying or crushing of rock for the period of discontinuance specified in the applicable ordinance.

policy against their extension or enlargement." (*County of San Diego* v. *McClurken, supra,* 37 Cal.2d 683, 687, and cases cited at fn. 1; *Paramount Rock Co.* v. *County of San Diego, supra,* 180 Cal.App.2d 217, 229; and see 8A McQuillin, *supra,* § 25.206, p. 114.)

The most recent decision of this court to address the question of intensified use, *Edmonds* v. *County of Los Angeles, supra,* 40 Cal.2d 642, did so in the context of a trailer park which was maintained for 20 trailers at the time a zoning ordinance which excluded that use was adopted. The number of trailers increased thereafter to 48, at which point the owners sought a permit to legalize the increase, but also claimed a vested right to use the property for that many trailers. The court analogized the expansion to adding new buildings and concluded that the increase was "clearly a different use" of the property than that existing when the zoning ordinance was adopted, noting that it would require an increase in the size of a " 'utility house' " for necessary "sanitary facilities." (*Id.* at p. 651.)

In *County of San Diego* v. *McClurken, supra,* 37 Cal.2d 683, the owner had used the land for heavy industrial purposes, among which was storage of gasoline in movable tanks above ground. After a zoning ordinance restricted that type of land use, the owner placed four permanently installed gasoline storage tanks on the property. The county sought their removal. We upheld the county's right to do so, holding that the tanks were not only an expansion of the nonconforming use, but a new and different use since they had a different purpose, storage of gasoline for service stations as opposed to industrial use. (*Id.* at p. 688.)

In *Edmonds* v. *County of Los Angeles, supra,* 40 Cal.2d 642, 651, the additional trailers to be placed on the property were equated to additional structures, a type of changed or intensified use which most jurisdictions refuse to permit as part of a nonconforming use. (See 8A McQuillin, *supra,* § 25.206, p. 114.) *County of San Diego* v. *McClurkin, supra,* 37 Cal.2d 683, involved both a new use and placing additional structures on the property. Because Hansen Brothers' mining is not a new use and under the diminishing asset doctrine may extend over the whole property, the question here differs. It involves only an increased volume of production by the existing use.

Decisions in other jurisdictions hold that the natural and reasonable expansion of a quarry business to meet increased demand is not an impermissible enlargement or change in the use of the property. In *Frank Casilio & Sons* v. *Zoning Hearing Bd., etc.* (1976) 26 Pa. Commw. 608 [364 A.2d 969, 970], the court acknowledged the rule applicable in that state that a

nonconforming use includes " 'the right of natural expansion *so long as that expansion is reasonable and not detrimental* to the welfare of the community,' " but held that an increase from an occasional truckload of sand and gravel leaving the property each day to as many as 30 a day was not reasonable.

In *Town of Wolfeboro (Planning Bd.)* v. *Smith, supra*, 556 A.2d at page 759, the court held that while an increase in intensity of a nonconforming use is not necessarily a change or expansion, "an increase in intensity which serves to change the character or purpose of the nonconforming use will be considered to have changed the use."

In *Union Quarries, Inc.* v. *Board of County Com'rs, supra*, 478 P.2d 181, 187, a small quarrying operation which sold rock to neighboring farmers was sold to a company which carried on substantial quarrying and sold a large volume of rock. The trial court found that this was not an enlargement of the original, lawful nonconforming use. In affirming that judgment, the Kansas Supreme Court held that it came within the rule that a natural growth of the business or an increase in the business done is not an impermissible change in a nonconforming use.

Again, while we have no evidence of the understanding of the legislative body which enacted Development Code section 29.2(A) as to the meaning of the term "enlarged or intensified," the general rule appears to be that an increase in business volume alone is not an expansion of a nonconforming use. (8A McQuillin, *supra*, § 25.207, p. 125.) Consistent with that understanding and the presumption that the intent was to enact a reasonable ordinance that would not be applied arbitrarily or unreasonably, we conclude that section 29.2(A) does not prohibit a gradual and natural increase in a lawful, nonconforming use of a property, including quarry property. By way of example, we assume that a grocery store operating as a lawful, nonconforming use in an area of increasing population would not be restricted to the same number of customers and volume of business conducted when the zoning ordinance was enacted. Neither an increase in the number of patrons or in the volume of goods sold would be considered an enlargement or intensification of the use. And where increased population creates an increased demand for the aggregate used in road construction, an increase in production to meet that demand would not be construed as an enlargement or intensification of the use.

Based only on the SMARA reclamation plan, the superior court and Court of Appeal concluded that Hansen Brothers' removal of the quantity of rock estimated in that plan would constitute an impermissible intensification of

use of the land. They based that conclusion in part on the assumption that the volume of rock quarried could be considered separately from the overall volume of aggregate produced from the Bear's Elbow Mine, and in part on reasoning that it was appropriate to compare the proposed volume of future extraction only with past hillside production from the Nevada County portion of the mine, even though a greater quantity or rock had been produced from the Placer County area and overall production included material from the riverbed area of the mine.

We concluded above that the vested interest held by Hansen Brothers is use of its Bear's Elbow Mine property for production and sale of aggregate, and that right included the extraction of all aggregate components. It was error therefore to treat the components separately when considering the intensification of use question, and to exclude production from the Placer County area. It is undisputed that the mine, which straddles the county line, has been operated as a single entity since it was established in 1946.

More importantly, however, the SMARA application form is not designed for, and alone is not an adequate basis upon which to decide, the question of impermissible intensification. The application form does not establish the actual amount of material that is to be mined in any given year or time, and offers only estimates in broad ranges of the possible annual mining volume and of the total amount of material that may be removed over a 100-year period.

Hansen Brothers' SMARA reclamation plan indicated only that between 5,000 and 250,000 cubic yards of material were to be removed annually. The Court of Appeal assumed that the upper end of the range, 250,000 cubic yards, rather than the lowest end, 5,000 cubic yards, would be removed each year.[31] Because there is no evidence of the actual amount of material to be extracted annually, the evidence does not support the conclusion of the superior court and the Court of Appeal that Hansen Brothers is not entitled to approval of its SMARA plan without a conditional use permit because the proposed volume of extraction would not be a permissible nonconforming use of the property.

Nothing in sections 2774 and 2776 requires that all questions of intensified use be addressed in conjunction with approval of a SMARA reclamation plan, however. All that need be established is that the applicant had obtained a vested right to conduct surface mining operations prior to January 1, 1976,

---

[31]That assumption ignored the fluctuating nature of Hansen Brothers' aggregate business and failed to consider that the plan called for removal of 5,000,000 cubic yards in 100 years, or an average of only 50,000 cubic yards per year, less than the amount of material removed from the site in prior years.

and the proposed mining is not a substantial change in the operation. Impermissible intensification of a nonconforming use is more appropriately addressed at such time as increased production actually occurs. The issue is no different, and the county's remedies are the same, as would exist independent of the SMARA application were Hansen Brothers' business to increase. When it appears that a nonconforming use is being expanded, the county may order the operator to restrict the operation to its former level, and seek an injunction if the owner does not obey. (*City of Fontana* v. *Atkinson, supra,* 212 Cal.App.2d 499, 508-509; see, e.g., *Town of Los Altos Hills* v. *Adobe Creek Properties, Inc.* (1973) 32 Cal.App.3d 488 [108 Cal.Rptr. 271]; see also the modified opinion in *F. O. Bither* v. *Baker Rock Crushing Co., supra,* 438 P.2d 988, mod. 249 Or. 652 [440 P.2d 368].)

Therefore, when the area over which Hansen Brothers has vested rights is determined, and if that area is less than 60 acres, a new or amended SMARA reclamation plan will be necessary. Even if the plan is unchanged, however, the intensification of use question must be reconsidered on remand if the county continues to require determination of that question before approval of a SMARA reclamation plan. Unless Hansen Brothers proposes immediate removal of quantities of rock which substantially exceed the amount of aggregate materials extracted in past years, there is no impermissible intensification of use.[32]

If the county elects to abandon the effort to address the intensification of use question in advance of actual mining as part of the SMARA reclamation plan approval process, the county is not without remedies if mining activity at the Bear's Elbow Mine increases in the future to a level that the county believes is excessive. As with any other nonconforming use, the county may seek an injunction or other penalties authorized by the zoning ordinance, whenever it believes that production at the mine has reached a level that constitutes an impermissible intensification of the nonconforming use for which Hansen Brothers has a vested right.

## V

### DISPOSITION

The judgment of the Court of Appeal is reversed with directions to order the superior court to vacate its order denying Hansen Brothers' petition for

---

[32]The county has not asserted that the emphasis on rock quarrying is a substantial change in the nature of the operation within the meaning of section 2776. It asserts only that the intensified use is such a change. Therefore, we express no opinion on whether, if Hansen Brothers no longer produces aggregate at the Bear's Elbow Mine and the operation becomes simply a rock quarry, the permit exemption of section 2776 will continue to apply.

writ of mandate and to conduct further proceedings consistent with this opinion to determine if Hansen Brother's SMARA plan should be approved.

Lucas, C. J., and Arabian, J., concurred.

**WERDEGAR, J.—** ██▐█ ██ ██ ██ ██ ██ ██ ██ ██ I concur. I write separately to articulate my understanding of what the plurality opinion has determined about the vitality of the diminishing asset doctrine and its application to this case.

First and foremost, California recognizes the diminishing asset doctrine. Second, in applying the doctrine to this case and determining the nature of the existing nonconforming use, we look to Hansen Brothers Enterprises, Inc.'s, Nevada County operation with all of its component parts as a whole. Thus, Hansen Brothers' entire operation of placer mining and rock quarrying to produce aggregate is the existing nonconforming use. Third, the diminishing asset doctrine permits Hansen Brothers to quarry, as part of the existing nonconforming use, any area of the property for which it can satisfy the doctrine's requirements. Specifically, Hansen Brothers must show " 'that the area [it] desires to excavate was clearly intended to be excavated [when the land-use ordinance became effective], as measured by objective manifestations and not by subjective intent . . . .' " (Plur. opn., *ante*, p. 556, italics omitted.)

As the plurality opinion explains, the record is not presently adequate to permit us to decide whether the diminishing asset doctrine assists Hansen Brothers and, if it does, how far from the river the doctrine might permit Hansen Brothers to move its quarrying operations. Past activities on the hillside may be relevant to this issue. The rock-quarrying aspect of the business, however, has taken place primarily, if not exclusively, near the river rather than farther up the hillside. While the record suggests that some activity occurred farther up the hillside, it does not establish what, exactly, that activity was or whether it occurred before or after the zoning ordinance took effect. If Hansen Brothers were to satisfy the requirements of the diminishing asset doctrine as to part or all of its property, then the quarrying of those areas would be exempt from the ordinance's permit requirement as part of the existing nonconforming use. What the trial court must decide on remand, as to this issue, is whether and, if so, to what geographical extent the requirements of the diminishing asset doctrine have been satisfied.

With this understanding, I concur in the plurality opinion.

Lucas, C. J., concurred.

MOSK, J.—I dissent. I would affirm the Court of Appeal's judgment.

On considering factual issues the plurality opinion imperiously concludes that:

The planning commission was wrong.

The board of supervisors was wrong.

The superior court was wrong.

The Court of Appeal was wrong.

To the contrary, it is the plurality opinion that is wrong.

The questions before us are (1) whether substantial evidence supports the superior court's findings that Hansen Brothers Enterprises, Inc., proposed to resurrect a long-abandoned mining operation on its land and greatly intensify the exploitation of that land, and (2) whether, if the findings are supported by substantial evidence, the law requires a conditional use permit before Hansen Brothers may begin the proposed expansion. The plurality opinion's conclusion that no permit is required rests on insufficient deference to the superior court's factual findings.

To meet the requirements of the Surface Mining and Reclamation Act of 1975 (Pub. Resources Code, § 2710 et seq.), Hansen Brothers needed to submit a reclamation plan to the board of supervisors for approval. (*Id.*, §§ 2728, 2770.) The board rejected the plan because it ran counter to a Nevada County ordinance that provides:

"Any use lawfully in existence at the time this Chapter [i.e., the county's zoning regulations] or amendments thereto takes effect, although such use does not conform to the provisions of this Chapter, may continue as follows:

"A. No such use shall be enlarged or intensified. Nor shall any such use be extended to occupy a greater area of land than that occupied at the time of the adoption of this Ordinance. Nor shall any such use be moved in whole or in part to any other portion of the lot or parcel of land occupied at the time of the adoption of this Chapter or amendment thereto.

"B. If the nonconforming use is discontinued for a period of one hundred eighty (180) days or more, any following use shall be in conformity with all applicable requirements of this Chapter." (Nevada County Land Use and Development Code, art. 29, § L-II 29.2.)

The board of supervisors also informed Hansen Brothers that to pursue its plan it would need to obtain a conditional use permit. Hansen Brothers filed

a petition for writ of administrative mandate (Code Civ. Proc., § 1094.5) and a complaint for damages and for injunctive and declaratory relief.

The superior court denied Hansen Brothers any relief. It ruled that because of the abandonment and the proposed expansion of the nonconforming use, Hansen Brothers had no right to engage in the mining it proposed. Specifically, it found, with regard to abandonment, that "the [hillside] operation has been largely inactive since 1986 except for storage of aggregate and one or two trips per year by trucks to or from the site. The area previously used as a rock quarry is overgrown with trees 15 feet tall. All of these factors cause[] the Court to conclude the hillside quarry operations were separate operations that had been discontinued for the statutory period." With regard to enlargement, it found that "[m]ining with a total production of 5,000,000 cubic yards of material, as reflected in the proposed reclamation plan, is a substantial change and expansion and intensification[,] as illustrated by the fact such proposed use would involve 120 [10-cubic-yard] truck trips per day as contrasted to the one or two per year shown by the evidence since 1986."

"Where a superior court is required to make . . . an independent judgment upon the record of an administrative proceeding, the scope of review on appeal is limited. An appellate court must sustain the superior court's findings if substantial evidence supports them. [Citations.] In reviewing the evidence, an appellate court must resolve all conflicts in favor of the party prevailing in the superior court and must give that party the benefit of every reasonable inference in support of the judgment. When more than one inference can be reasonably deduced from the facts, the appellate court cannot substitute its deductions for those of the superior court." (*Pasadena Unified Sch. Dist.* v. *Commission on Professional Competence* (1977) 20 Cal.3d 309, 314 [142 Cal.Rptr. 439, 572 P.2d 53].) The superior court was required to make an independent judgment on the administrative record here. (*Halaco Engineering Co.* v. *South Central Coast Regional Com.* (1986) 42 Cal.3d 52, 64, fn. 10 [227 Cal.Rptr. 667, 720 P.2d 15].)

Whether the standard set forth in *Pasadena Unified Sch. Dist.* v. *Commission on Professional Competence, supra*, 20 Cal.3d 309, 314, applies in every instance we need not decide. It is clear that it applies in this case. A ruling that a nonconforming use was intensified or abandoned involves a question of fact that we review on a deferential standard. (See *McCaslin* v. *City of Monterey Park* (1958) 163 Cal.App.2d 339, 348 [329 P.2d 522]; cf. *Texas Nat. Theatres* v. *City of Albuquerque* (1982) 97 N.M. 282, 288 [639 P.2d 569, 575] [applying New Mexico substantial evidence standard].)

Before turning to the question whether substantial evidence supports the superior court's findings of abandonment and intensification, we must review the law applicable to those matters.

Because a nonconforming use "endangers the benefits to be derived from a comprehensive zoning plan" (*City of Los Angeles* v. *Gage* (1954) 127 Cal.App.2d 442, 459 [274 P.2d 34]), the law aims to eventually eliminate it (*City of Los Angeles* v. *Wolfe* (1971) 6 Cal.3d 326, 337 [99 Cal.Rptr. 21, 491 P.2d 813]). However, to avoid constitutional problems an existing nonconforming use will be tolerated as long as it does not expand to a significant extent. (*Edmonds* v. *County of Los Angeles* (1953) 40 Cal.2d 642, 651 [255 P.2d 772]; *Sabek, Inc.* v. *County of Sonoma* (1987) 190 Cal.App.3d 163, 166-167 [235 Cal.Rptr. 350].) " 'The underlying spirit of a comprehensive zoning plan necessarily implies the restriction, rather than the extension, of a nonconforming use of land, and therefore . . . a condition that the lawful nonconforming use of land existing at the time of the adoption of the ordinance may continue must be held to contemplate only a continuation of substantially the same use which existed at the time of the adoption of the ordinance, and not some other and different kind of nonconforming use which the owner of the land might subsequently find to be profitable or advantageous. . . .' " (*County of Orange* v. *Goldring* (1953) 121 Cal.App.2d 442, 447 [263 P.2d 321], quoting *In re Botz* (1942) 236 Mo.App. 566 [159 S.W.2d 367, 372].) Moreover, the use must be continuous: if abandoned, it may not be resumed. " ' "A nonconforming use is a lawful use existing on the effective date of the zoning restriction and continuing since that time in nonconformance to the ordinance." . . . .' [Citations.] Nonuse is not a nonconforming use. . . . This rule is consistent with the further rule that reuse may be prohibited when a nonconforming use is voluntarily abandoned." (*Hill* v. *City of Manhattan Beach* (1971) 6 Cal.3d 279, 285-286 [98 Cal.Rptr. 785, 491 P.2d 369].)

Substantial evidence supports the superior court's findings of abandonment and proposed intensification.

As regards abandonment: a neighbor of Hansen Brothers presented to the board of supervisors a series of photographs and testified that the hillside has "trees of 10 to 15 years growing over" them. The photographs evidently became the center of the board's attention as other neighbors discussed them. One said that the photographs showed that the hillside excavations were "just primarily top soil" and that the presence of tall trees made it "quite obvious that none of that quarrying operation has gone on for many years." The foregoing evidence caused one member of the board to state, "I was much impressed by the photographs that we had of the sites which had been once upon a time quarried. And upon those sites we have 25- and 30-foot trees indicating that certainly for a good number of years that site has been undisturbed . . . . [¶] The documentation I have before me shows me that those areas haven't been mined in years and years and years."

Yet another neighbor sent a handwritten letter to the board of supervisors, stating in part: "We have a home in the community where the Hansen Brothers are wanting to start a new mining operation alongside the Bear River. Our house is on a hill overlooking the river and the beautiful wooded hills around it. During the 3½ years we have lived here, the Hansen's [sic] gravel operation has been inactive. . . . We have *never* seen any Hansen trucks on the road or any mining activity at the site. We have observed only a couple [of] piles of gravel which have stayed there untouched. . . ."

Indeed, there was testimony that more than *20 neighboring property owners* signed a petition against Hansen Brothers' plan, declaring in part that, "we can personally attest to the lack of activity at the gravel quarry over the last few years."

As regards intensification: recall that there was evidence that previous excavations consisted of cuts in the topsoil. Under the reclamation plan, Hansen Brothers would begin a drill-and-blast operation that would carve out *500,000* cubic yards of overburden—approximately the volume of *200,000* standard-sized pickup truck beds—and would excavate and remove from the site an average of *50,000* cubic yards of material—a rough equivalent to the volume of *20,000* pickup-truck beds—*every year for the next century.*

As one witness, a registered civil engineer and lawyer with 40 years' experience in mining, told the planning commission, "they're talking about making a cut there with vertical rock faces at about 20-foot intervals benched of [sic] about 300 feet high. . . . And it's about a half a mile long. And you don't get rock to stand at those angles without it being of a quality that it has to be drilled and blasted." The previously quoted handwritten letter stated: "The mining operation the Hansen[s] are proposing would be a *total* change from the operation we have observed over the past 3½ years. They have never touched the hills or land rock. A commencement of such activity would be a great disruption of the tranquility and beauty of the stable community which has built up in this area—an area which is zoned for light farming . . . . It would be an activity completely incompatible with the single-family parcels and open spaces currently in this community."

In sum, the record contains substantial evidence to support the superior court's findings of abandonment and proposed intensified use.[1]

Fairly examined, the record reveals that Hansen Brothers proposes to move its nonconforming mining operation from a riverbed and a riverbank to

---

[1] It is true that no evidence supports the superior court's conclusion that there would be 120 large-truck trips per day under the proposed plan. The court relied on testimony that

nearly pristine hillsides, where its new mine will create a moonscape. It is, as the superior court found, a proposed "separate operation[] . . . ." And this destruction will occur without so much as the requirement of a permit.[2]

I cannot agree with this doleful outcome, which will occur in violation of settled legal principles. I therefore dissent.

**KENNARD, J.,** Dissenting.—When a public entity enacts a zoning ordinance prohibiting owners of private property from using their land in a specified manner, it generally permits those property owners already using their land in the prohibited manner to continue doing so, as a "nonconforming use." This case concerns the degree to which public entities may regulate the scope of a nonconforming use; the nonconforming use here is mining.

Originally, plaintiff's mining operations consisted almost entirely of scraping up gravel that had washed down a river, but plaintiff also operated a small rock quarry on land adjacent to the river. After a county ordinance was passed prohibiting mining in the area involved, plaintiff was permitted to continue mining as a nonconforming use. Now, because an upstream dam has rendered plaintiff's riverbed operations virtually worthless, plaintiff seeks to greatly expand the intensity of its quarrying operations, and to remove rock at an annual rate of up to 250 times greater than past removal by plaintiff. The county planning commission, the county board of supervisors, the superior court, and the Court of Appeal all concluded that whatever right plaintiff enjoyed to scoop gravel from the riverbed could not be converted into a right to quarry rock out of the adjacent hillsides, and that plaintiff's planned expansion exceeded the scope of its right to mine the property as a nonconforming use. A majority of this court[1] comes to a contrary conclusion, holding that plaintiff's two mining operations—those in the riverbed and those on the adjacent land—must be viewed as a single

---

overstated the number of trips by an order of magnitude. Nevertheless, 12 trips a day (a figure supported by substantial evidence) by large trucks over what testimony revealed to be narrow and winding roads is a great increase from virtually no truck movement at all.

[2]The plurality opinion leaves open the question whether intensification of Hansen Brothers' nonconforming use will eventually violate the zoning ordinance. The superior court's findings already establish, however, that it will. In any event, the practical problem with the plurality opinion's holding is that, by the time the evidence of intensification becomes apparent and a remedy is sought and obtained, serious damage may well already have been inflicted.

[1]Justice Baxter's lead opinion has been signed by the Chief Justice and Justice Arabian. A fourth Justice, Justice Werdegar, concurs in Justice Baxter's opinion, although she has not signed it. Because I see no significant differences between the views expressed in Justice Baxter's lead opinion and Justice Werdegar's concurring opinion, I use the term "majority" to refer collectively to Justices Baxter, Arabian, Werdegar, and the Chief Justice. When referring to Justice Baxter's opinion, I shall call it the "lead opinion."

nonconforming use. The majority directs the Court of Appeal to remand the case to the trial court for reconsideration in light of this conclusion.

I disagree with the majority. Substantial evidence supports the determinations by the board of supervisors and the trial court that plaintiff's mining of the riverbed and its mining of the adjacent land were separate uses. Viewed in this light, plaintiff's proposed plan represents a substantial intensification of its previous mining operations, and is therefore beyond the scope of its nonconforming use.

I

Since 1946, mining has been conducted on land that plaintiff purchased in 1954. The land is located on the Bear River, which divides Nevada and Placer Counties; the site is a wooded, scenic area near the town of Colfax, in the Sierra foothills. The mining involves roughly 60 acres, most of which is in Nevada County.[2]

In 1954, the Nevada County Board of Supervisors adopted a zoning ordinance prohibiting mining in an area that included plaintiff's property. Nevertheless, as authorized by another ordinance, Nevada County Land Use and Development Code, article 29, section L-II 29.2 (hereafter section 29.2), the county has permitted plaintiff to continue its mining operations. Under section 29.2, when the county adopts a zoning ordinance prohibiting certain activities or "uses," property owners who are already engaged in those uses may continue to do so, as a "nonconforming use."

Section 29.2 strictly limits the scope of nonconforming uses: they may not be "enlarged or intensified," "extended to occupy a greater area of land," or "moved in whole or in part to any other portion of the [property owner's] land." Also, any nonconforming use that is "discontinued for a period of one hundred eighty (180) days or more" loses its status as a nonconforming use.[3]

In 1989, plaintiff submitted a "reclamation plan" to Nevada County to comply with California's Surface Mining and Reclamation Act of 1975.

[2]As the lead opinion notes, plaintiff acquired some portions of the property at issue after 1954. Without a conditional use permit, plaintiffs may mine these portions of the property only if they were being mined in 1954, when the county prohibited mining. (Lead opn., ante, at pp. 560-564.) Because I have no quarrel with the lead opinion's treatment of this issue, I do not discuss the facts concerning the points in time at which plaintiff acquired its property.

[3]Section 29.2 provides in full:

"Any use lawfully in existence at the time this Chapter or amendments thereto takes effect, although such use does not conform to the provisions of this Chapter, may continue as follows:

"A. No such use shall be enlarged or intensified. Nor shall any such use be extended to occupy a greater area of land than that occupied at the time of the adoption of this Ordinance. Nor shall any such use be moved in whole or in part to any other portion of the lot or parcel

(Pub. Resources Code, § 2710 et seq.; hereafter SMARA.) This state law requires those engaged in surface mining to submit to a local agency, in this case the Nevada County Board of Supervisors, a reclamation plan describing the efforts to be made in minimizing adverse environmental effects resulting from the mining. No mining is permitted unless the agency approves the plan.[4]

Plaintiff's reclamation plan is set forth on a form furnished by Nevada County. According to the plan, the hillsides on plaintiff's property contain 5,000,000 cubic yards of rock. Plaintiff proposes to remove all of this rock over the course of the next 100 or more years. The form requires those submitting a reclamation plan to describe—by checking the appropriate boxes on the form—the amount of materials that will be mined. Plaintiff checked 2 boxes, indicating that, depending on demand of its customers, it intended to remove between 5,000 to 50,000, or between 50,000 and 250,000, cubic yards per year. Plaintiff expects to remove 1,000,000 cubic yards of "overburden" covering the rock. Most of that material will be used to build access roads needed in the excavation process; 150,000 cubic yards of overburden, described as "soil," will be stored on the property and used in the reclamation process. Implementation of the plan will necessitate drilling and blasting, and will require excavation of plaintiff's hillsides to a depth of 350 feet.

Both the Nevada County Planning Commission and the Nevada County Board of Supervisors conducted separate hearings to decide whether plaintiff's reclamation plan should be approved. At those hearings, the following evidence was presented regarding plaintiff's mining activities.

In 1954, and for many years thereafter, plaintiff's primary mining activity consisted of harvesting gravel that washed down the Bear River (hereafter also referred to as riverbed mining). These materials were stored on site and sold. To accommodate customers who wanted riverbed gravel mixed with hard rock, plaintiff also operated small quarries on either side of the river to

---

of land occupied at the time of the adoption of this Chapter or amendment thereto.

"B. If the nonconforming use is discontinued for a period of one hundred eighty (180) days or more, any following use shall be in conformity with all applicable requirements of this Chapter."

[4]Plaintiff also submitted a reclamation plan to the Placer County Board of Supervisors for the portion of plaintiff's property located in Placer County. That board approved plaintiff's plan.

extract rock.[5] Depending on the needs of its customers, plaintiff sold gravel and rock, or a combination of the two. The record does not disclose how much of the gravel sold by plaintiff was mixed with rock, or how many of plaintiff's customers bought such a mixture.

Nor does the record show how much gravel plaintiff and its predecessors removed annually from the Bear River. Bill Goss, plaintiff's plant manager, estimated that during the 18 years he had worked at the site, the total amount of materials harvested from the riverbed and mined from the quarries was roughly 3,000,000 tons. According to Goss, one-fifth of this total (or 600,000 tons) was rock extracted from the quarries and the rest gravel taken from the riverbed. Other evidence, however, showed that a far smaller portion was actually mined from the quarries. Alan Hess, a photogrammetric engineer, estimated, based on aerial photographs of the site, that in the 43 years during which the mining had been conducted (more than twice the length of time during which plant manager Goss had worked for plaintiff), only 266,000 tons of rock had been removed from the Placer County side of the river, and only 72,000 tons (or 45,000 cubic yards) had been quarried from the Nevada County side.

After construction of the Rollins Reservoir Dam, upstream from plaintiff's property, the amount of gravel washing down the river declined dramatically.[6] In early 1986, a flood washed a substantial quantity of sand and gravel over the dam; plaintiff harvested those materials in 1986 and 1987. Thereafter, plaintiff ceased its riverbed mining, but continued to store rock and gravel on the property. Although witnesses for plaintiff asserted that plaintiff continued to operate the quarry,[7] neighbors opposed to plaintiff's reclamation plan provided conflicting evidence. Randall Atkins, who lived near the mine, told the planning commission that he had purchased gravel from plaintiff in the past, but that in recent years he had been unable to do so because, in his words, "there is no operation there." Atkins's comments were confirmed by Bill Dickson, who also lived near the mine. According to other witnesses living near the mine, there had been no more than three trucks traveling along the road to the mine in the year and a half preceding the

---

[5]For convenience, I refer to the substances harvested from the river as "gravel" and the hard rock quarried from the adjacent land as "rock," although these terms no doubt lack technical precision.

[6]Several witnesses mentioned that the dam was already in existence in 1986, but no evidence was introduced establishing the date on which the dam was completed. The dam was probably built in the early 1980's.

[7]Notwithstanding the evidence that quarrying activity had occurred on both sides of the river, all witnesses mentioned only one quarry, apparently the one located on the north side of the river, in Nevada County.

hearing before the planning commission. And in a letter dated October 3, 1988, Nevada County Counsel James Curtis stated that he had visited the mine and concluded that "the last time any mining occurred on land was more than three years ago."

The Nevada County Planning Commission, acting in its capacity as a local agency under SMARA, denied approval of plaintiff's reclamation plan. As relevant here, the commission also concluded that the mining operations described in the plan exceeded the scope of plaintiff's nonconforming use under section 29.2, the county ordinance governing nonconforming uses; the commission left open the possibility that plaintiff could continue its mining operations if it obtained a conditional use permit.

The planning commission determined that the mining described in plaintiff's reclamation plan was not within the scope of plaintiff's nonconforming use because (1) mining under the proposed plan would violate section 29.2's requirement that nonconforming uses may not be "enlarged or intensified," and (2) plaintiff had quarried no rock for a period of more than 180 days and therefore was deemed to have abandoned its right to mine the land.[8] Plaintiff appealed the commission's decision to the Nevada County Board of Supervisors, which upheld the planning commission.

Plaintiff then filed a petition for administrative mandate in the superior court, seeking a judicial determination that the mining described in its permit application was a permissible continuation of its preexisting nonconforming use, and that it could engage in such operations without obtaining a conditional use permit.[9] After an independent examination of the administrative record, the superior court ruled that plaintiff had received a fair hearing before the Nevada County Planning Commission and the Board of Supervisors. The court found that (1) the mining described in plaintiff's reclamation plan was a "substantial expansion and intensification of any previous use of the property," and that (2) plaintiff had abandoned its right to mine the hillsides on its property. The Court of Appeal affirmed.

II

As a general rule, local governmental entities may use their zoning power to prohibit a property owner from using the property in a specified manner,

___

[8]Although the planning commission found that plaintiff had abandoned the right to mine the remainder of its land, it determined that plaintiff retained the right to extract gravel from the river.

[9]Plaintiff has also appealed Nevada County's rejection of plaintiff's reclamation plan. That appeal, however, was made to the State Mining and Geology Board (which has apparently postponed resolution of the appeal pending the outcome of this litigation), and was not the subject of plaintiff's petition in the superior court. Thus, the adequacy of plaintiff's reclamation plan is not at issue in this case.

and such restrictions ordinarily will not constitute a "taking" that would entitle the property owner to "just compensation" under the Fifth Amendment to the United States Constitution. (*Penn Central Transp. Co.* v. *New York City* (1978) 438 U.S. 104, 125 [57 L.Ed.2d 631, 648-649, 98 S.Ct. 2646].) But "because of the hardship and doubtful constitutionality" of forbidding a property owner from conducting a use that is already ongoing when an ordinance prohibiting that use is enacted, most zoning ordinances permit any such use to continue as a "nonconforming use." (*County of San Diego* v. *McClurken* (1951) 37 Cal.2d 683, 686 [234 P.2d 972].)

A property owner's right to continue a nonconforming use, however, is a right that is limited, narrowly construed, and subject to ultimate extinction. "[Z]oning legislation looks to the future in regulating district development and the eventual liquidation of nonconforming uses within a prescribed period commensurate with the investment involved. [Citation.] The mere fact that some hardship may thereby be experienced is not controlling, for 'every exercise of the police power is apt to affect adversely the property interest of somebody.' " (*Livingston Rock etc. Co.* v. *County of L.A.* (1954) 43 Cal.2d 121, 127 [272 P.2d 4].) As a result, "courts throughout the country generally follow a strict policy against [the] extension or enlargement" of nonconforming uses. (*County of San Diego* v. *McClurken, supra,* 37 Cal.2d at p. 687; see also *City of Los Angeles* v. *Wolfe* (1971) 6 Cal.3d 326, 337 [99 Cal.Rptr. 21, 491 P.2d 813] ["The policy of the law is for elimination of nonconforming uses . . . ."].)

With these principles in mind, I turn to section 29.2, the nonconforming use ordinance at issue, and apply it to the facts of this case.

### III

As I have noted previously, section 29.2 provides that a nonconforming use may not "be extended to occupy a greater area of land" and may not "be moved in whole or in part to any other portion" of the land in question. Thus, on its face, section 29.2 seemingly would bar plaintiff from extending its mining activities to any part of its property not being mined when the zoning ordinance prohibiting mining was enacted in 1954.

As applied to mining and similar activities, a prohibition against expanding the use to other portions of the land may be tantamount to prohibiting the use altogether. A leading treatise explains: "Application of the rule that a nonconforming use may not be extended to land not so used prior to the enactment of a restrictive ordinance may work a singular hardship where the use in question involves the removal of natural products from the earth.

Quarries and sources of topsoil are particularly vulnerable because, by their very nature, they commence on one spot and spread to additional ground as the gravel, coal, or topsoil is exhausted." (1 Anderson, American Law of Zoning (3d ed. 1986) § 6.52, p. 604, fn. omitted.)

To address this problem, courts in other states have developed what is now known as the diminishing asset doctrine, under which a landowner may not be prohibited from extending an otherwise permissible nonconforming use onto adjacent portions of the owner's property if the use consists of extracting nonrenewable resources from the earth. (See 1 Anderson, *op. cit. supra*, § 6.52, pp. 604-605, and cases cited therein.) Before today's decision by this court, the status of the diminishing asset doctrine in California was somewhat uncertain because only one published decision by a California court, *McCaslin* v. *City of Monterey Park* (1958) 163 Cal.App.2d 339 [329 P.2d 522], had addressed the diminishing asset issue.

In *McCaslin*, the plaintiff mined decomposed granite at a 70-acre site in Monterey Park. The city first enacted a zoning ordinance prohibiting mining, then enacted a second ordinance prohibiting any expansion of the plaintiff's mine onto adjoining property. The trial court enjoined enforcement of the second ordinance. In affirming that ruling, the Court of Appeal stated: "Defendants assert that . . . plaintiff was limited to excavating that portion of the property already excavated. We do not agree. The very nature and use of an extractive business contemplates the continuance of such use of the entire parcel of land as a whole, without limitation or restriction to the immediate area excavated at the time the ordinance was passed." (*McCaslin* v. *City of Monterey Park, supra*, 163 Cal.App.2d at p. 349.) Although *McCaslin* did not use the term "diminishing asset doctrine," the passage I have just quoted indicates *McCaslin*'s acceptance, in substance, of the principles underlying the doctrine.

The majority in this case embraces the diminishing asset doctrine. In essence, the majority creates a presumption that any local governmental entity enacting a zoning ordinance that permits a property owner to continue to engage in nonconforming uses but prohibits expansion of those uses to other portions of the owner's property has adopted the diminishing asset doctrine. (Lead opn., *ante*, at p. 559.) I have no quarrel with this conclusion insofar as it applies to mines that extract materials from the ground; it should

not, however, apply to a mine that, as here, extracts materials washing down a stream or river.[10]

Although a number of decisions from other jurisdictions have adopted the diminishing asset doctrine, no court, so far as my research has disclosed, has applied the doctrine to a riverbed mine. (See *Hawkins* v. *Talbot* (1957) 248 Minn. 549 [80 N.W.2d 863, 864] [gravel pit]; *Stephan & Sons* v. *Municipality of Anchorage* (Alaska 1984) 685 P.2d 98, 99 [56 A.L.R.4th 761] [same]; *Gibbons & Reed Company* v. *North Salt Lake City* (1967) 19 Utah 2d 329 [431 P.2d 559, 563] [same]; *County of Du Page* v. *Elmhurst-Chicago Stone Co.* (1960) 18 Ill.2d 479 [165 N.E.2d 310, 311] [open pit limestone quarry]; *Moore* v. *Bridgewater Tp.* (1961) 69 N.J.Super 1 [173 A.2d 430, 431] [stone quarry]; *Smart* v. *Dane County Bd. of Adjustments* (1993) 177 Wis.2d 445 [501 N.W.2d 782, 783] [mine described as "pit"; materials extracted not named]; *Syracuse Aggregate Corp.* v. *Weise* (1980) 51 N.Y.2d 278 [434 N.Y.S.2d 150, 414 N.E.2d 651, 652-653] [sand, gravel, and topsoil excavation].) Unlike other mines, the "assets" of a riverbed mine do not "diminish": the owner can "mine" the same area again and again, removing new sand and gravel that washes downstream. By its very nature, such a mine is not designed to spread over the entire land; rather, the mine is confined to the bed of the body of water on which it is located. As I explained earlier, underlying the creation of the diminishing asset doctrine was the recognition that, in general, mining operations must move from one spot to another, to allow for extraction of materials from additional ground after exhaustion of a previous mining source. That cannot be said of a mining operation that extracts materials washing down a stream or a river, and therefore the diminishing asset doctrine should not apply to such mining.

Furthermore, although the diminishing asset doctrine permits mine operators to extend their mines to portions of their property not previously excavated, the doctrine does not restrict the power of a governmental entity to limit, as was done here, the *intensity* of the operator's mining activities. Thus, in this case the doctrine has no bearing on that portion of section 29.2 providing that a nonconforming use may not be "intensified."

IV

Here, the county planning commission, the county board of supervisors, the trial court, and the Court of Appeal all determined that the excavation

---

[10]The lead opinion declines to address whether the diminishing asset doctrine applies to such mines, asserting that it is not an issue in this case. (Lead opn., *ante*, at p. 542, fn. 6.) But as I shall explain in part IV, *post*, it is an issue, because it is relevant to the question whether plaintiff's riverbed mine and its quarry may be viewed separately to determine whether plaintiff proposes an intensification of its use of the property.

proposed in plaintiff's reclamation plan exceeded the scope of plaintiff's nonconforming use, because it violated section 29.2's requirement that nonconforming uses may not be "intensified." They therefore concluded that, without a conditional use permit, plaintiff could not engage in the mining operations described in its reclamation plan.[11] They reached this conclusion by a two-step process.

First, they found that plaintiff's riverbed mining and its rock quarrying were two separate "uses" of its property, rejecting plaintiff's assertion that all of its mining operations were an indivisible unit. Second, they compared plaintiff's rock quarrying operation to the quarrying proposed in plaintiff's reclamation plan, and concluded that the intensity of the quarrying in the reclamation plan greatly exceeded that of plaintiff's previous quarrying operations.

The lead opinion rejects the first step of that analysis. It asserts that the issue of whether plaintiff's reclamation plan proposes an intensification of its previous mining activity should be decided by comparing plaintiff's proposal to the amount mined in plaintiff's entire operation, including the amount extracted from the river. I disagree.

Although closely related, plaintiff's riverbed mine and the quarry from which it extracts rock are separate operations that remove different types of materials; neither operation depends on the other for its continued existence. Before construction of the Rollins Reservoir Dam, plaintiff's mining operation was devoted almost entirely to the removal of gravel from the river. On some occasions, at the request of customers, plaintiff mixed the gravel extracted from the river with rock quarried from the adjacent land. Other customers, however, purchased either gravel only, or rock only. Thus, although plaintiff sometimes combined the rock mined from the quarry with the gravel mined from the river, plaintiff offered no evidence that the continued operation of the quarry was an indispensable part of the riverbed mining operation, or vice versa. Because the riverbed mine and the quarry on the adjacent land produced, in essence, two separate "products" extracted from different parts of the property and sold to different customers, the county board of supervisors and the trial court could properly regard the

---

[11]The planning commission, the board of supervisors, the trial court, and the Court of Appeal also determined, in the alternative, that plaintiff's plan required a conditional use permit because plaintiff had abandoned the right to mine the land on its property. Because I conclude that plaintiff's reclamation plan represented a substantial intensification of plaintiff's mining operation, and thus necessitated a conditional use permit, I do not address this alternative ground relied on by the planning commission, the board of supervisors, the trial court, and the Court of Appeal.

mining of the riverbed and the mining of the quarry as two separate "uses" rather than a single nonconforming use.

The fundamental difference between riverbed mines and quarries, as I have set forth in part III, *ante*, provides an additional ground for treating them as two separate "uses" instead of a single nonconforming use in deciding whether a change in either operation amounts to an intensification. As I have pointed out, the diminished asset doctrine applies to quarries but not to riverbed mines because riverbed mines are continually replenished when new materials are washed downstream, and operators of such mines therefore need not expand to other portions of their property to continue in operation. Because a quarry needs to expand simply to continue to exist, determining whether such expansion amounts to an intensification or instead is simply a necessary extension of the existing mine presents an issue that is entirely different from deciding whether a riverbed mine's proposed expansion of operations is an intensification of its existing use. For this reason, it is appropriate for nonconforming use purposes to regard a riverbed mine and a land-based quarry as two separate "uses" rather than a single nonconforming "use."

To support its conclusion that plaintiff's riverbed gravel mine and its nearby rock quarry must be viewed as one nonconforming use, the lead opinion, quoting a respected treatise, states: "'[O]ne entitled to a nonconforming use has a right to . . . engage in uses normally incidental and auxiliary to the nonconforming use . . . .'" (Lead opn., *ante*, p. 565, quoting 8A McQuillin, Municipal Corporations (3d ed. 1994) § 25.200, p. 89.) The lead opinion appears to suggest that plaintiff's quarry is a use "normally incidental to and auxiliary to" plaintiff's riverbed mine, and that the two mines should therefore be treated as an indivisible unit. But here, as I have shown, substantial evidence supports the trial court's conclusion that plaintiff's quarry was not just an "auxiliary" to plaintiff's riverbed mine, but a separate, independent "use."[12]

The lead opinion also advances the theory that plaintiff's quarry is an "integral part" of plaintiff's mining business, which in the past consisted

[12]On a petition for administrative mandate challenging an administrative order that substantially affects a fundamental vested right, as in this case, the trial court must "'exercise its independent judgment on the evidence and find an abuse of discretion if the [administrative] findings are not supported by the weight of the evidence.'" (*Halaco Engineering Co.* v. *South Central Coast Regional Com.* (1986) 42 Cal.3d 52, 64, fn. 10 [227 Cal.Rptr. 667, 720 P.2d 15], quoting *Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 32 [112 Cal.Rptr. 805, 520 P.2d 29].) A reviewing court must uphold the trial court's findings so long as they are supported by substantial evidence, resolving all factual inferences in favor of the party prevailing in the trial court. (*Pasadena Unified Sch. Dist.* v. *Commission on Professional Competence* (1977) 20 Cal.3d 309, 314 [142 Cal.Rptr. 439, 572 P.2d 53].)

primarily of mining the riverbed. (Lead opn., *ante*, at pp. 565, 568.) It states: "*Unless an independent aspect of the business had been discontinued*, the use may not be broken down into component parts and vested rights recognized for less than the entire business operation." (*Id.* at p. 566, italics added.) In this case, however, plaintiff's reclamation plan proposes to discontinue "an independent aspect of the business," namely, its riverbed mining operation. The plan specifically states that "no additional gravel removal is expected in the 100 year flood channel of the Bear River."[13] This means that the riverbed mine will cease to exist. Because plaintiff proposes to discontinue "an independent aspect of the business" (the riverbed mine), even under the lead opinion's analysis the county board of supervisors and the trial court could break down plaintiff's mining use into its "component parts." Accordingly, in determining whether plaintiff's reclamation plan represents an intensification of plaintiff's previous mining activities, the county board of supervisors and the trial court could properly ignore the discontinued "component part" (the riverbed mine) and base the intensification determination only on the sole part remaining: the quarry.

For the reasons set forth above, the Nevada County Planning Commission, the Nevada County Board of Supervisors, the trial court, and the Court of Appeal, correctly concluded that plaintiff's quarry and its riverbed mine are not an indivisible, integrated operation, but instead are two separate uses. Accordingly, in determining whether plaintiff's reclamation plan, which did not involve riverbed mining, represented a change in the intensity of plaintiff's nonconforming use, these entities properly compared the intensity of the mining activities plaintiff proposed in the plan to plaintiff's previous quarrying activities, without consideration of plaintiff's riverbed mining operations. Based on this comparison, these entities concluded that plaintiff's reclamation plan proposes a substantial intensification of plaintiff's previous quarrying activities. As I shall explain, substantial evidence supports this conclusion.

In the 43 years (1946-1989) during which mining has been conducted on plaintiff's land, a total of roughly 45,000 cubic yards, or roughly *1,000* cubic yards per year, has been removed from the quarry in Nevada County.[14] Plaintiff now proposes to quarry between *5,000* and *250,000* cubic yards of rock per year over the next century. Thus, plaintiff seeks authorization to remove rock from its hillsides at a rate that is as much as 250 times greater than plaintiff has taken out in the past.

---

[13]Presumably, the reason plaintiff does not expect to continue extracting gravel from the river is that, as a result of the building of the Rollins Reservoir Dam, there is no more gravel to extract.

[14]Additional rock has been quarried from that portion of plaintiff's property located on the Placer County side of the river.

To guide the trial court in its consideration of the intensification issue on remand, the lead opinion states that a "gradual and natural" increase in the volume of a mining operation is not an intensification of the operation, and therefore does not violate section 29.2's provision that nonconforming uses may not be "intensified." (Lead opn., *ante*, at p. 573.) This statement hardly seems consistent with this court's "strict policy against [the] extension or enlargement" of nonconforming uses (*County of San Diego* v. *McClurken*, *supra*, 37 Cal.2d at p. 687), and the expectation in zoning legislation that nonconforming uses will eventually be extinguished "within a prescribed period commensurate with the investment involved." (*Livingston Rock etc. Co.* v. *County of L.A.*, *supra*, 43 Cal.2d at p. 127.) But even if a "gradual and natural" increase would not violate section 29.2, the Nevada County Board of Supervisors and the trial court could reasonably conclude that the intensification proposed by plaintiff, which includes mining operations on a scale up to 250 times greater than those conducted by plaintiff in the past, is not "gradual and natural."[15]

## CONCLUSION

For the reasons set forth above, I would affirm the judgment of the Court of Appeal.

George, J., concurred.

Respondents' petition for a rehearing was denied February 29, 1996. Mosk, J., Kennard, J., and George, J., were of the opinion that the petition should be granted.

---

[15]The lead opinion asserts that "the SMARA application form is not designed for, and alone is not an adequate basis upon which to decide, the question of impermissible intensification." (Lead opn., *ante*, at p. 574.) The lead opinion suggests that Nevada County wait until it determines that plaintiff's mining activities have exceeded the scope of its nonconforming use, after which it can seek injunctive relief. (*Id.* at pp. 574-575.) But the Nevada County Board of Supervisors' conclusion that plaintiff's reclamation plan exceeded the scope of plaintiff's nonconforming use was based not only on the SMARA application form, but also on the hearings conducted initially by the planning commission and then by the board. The lead opinion's suggestion is not a good one, either from plaintiff's perspective or the county's. It would be much more efficient for plaintiff to determine the scope of its right to mine its property before plaintiff begins the substantial investment in employees and equipment necessary to conduct the operations described in its reclamation plan, than to attempt to do so after such operations have begun. Similarly, the county's interests will be better served if it can halt illegal activities on plaintiff's land before those activities have begun.